**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-237-CJN** |
| **WILLIAM "JESSE" STOVER** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William "Jesse" Stover to fourteen months of incarceration, thirty-six months of probation, $2,000 restitution, and a $100 special assessment.

## I.    INTRODUCTION

The defendant, William "Jesse" Stover, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Stover, a 44-year-old flooring specialist from Kentucky, travelled to Washington, D.C., with two companions and attended the "Stop the Steal" rally at the Ellipse before going to the Capitol. At the Capitol, Stover, wearing a protective face shield and chest padding designed for use in paintball, entered the restricted perimeter and climbed the West Front of the building despite there being ample signals that he was not permitted to enter the area. He then approached the Lower West Terrace tunnel. Stover ultimately entered the tunnel three times: first at 2:54 p.m., then again at 3:16 p.m., and for a third time at 3:50 p.m. Each time that he entered the tunnel, he watched officers inside the tunnel get repeatedly assaulted directly in front of him and joined in the mob's coordinated efforts to overwhelm the officers. During his final entrance into the tunnel, Stover climbed up on to the wooden structure that had been built around the mouth of the tunnel to increase his leverage against police and struck an officer on his riot helmet while he was trying to grab another officer's chemical irritant cannister.

The government recommends that the Court sentence Stover to fourteen months of incarceration on his conviction of violating 18 U.S.C. § 231(a)(3). A fourteen-month sentence, the midpoint of Stover's calculated guidelines, is warranted because Stover entered the Lower West Terrace tunnel three times. Some of the worst violence on January 6 occurred in the Lower West Tunnel, and Stover personally participated in the crowd's efforts to attempt to overwhelm the officers struggling to hold back the rioters and contributed to the combined efforts of the crowd against the officers. A fourteen-month sentence reflects the gravity of Stover's conduct in the

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Lower West Terrace tunnel on January 6 and also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 1-1, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     The Assault on the Lower West Terrace Tunnel

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the

backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries. How the Lower West Tunnel usually appears on Inauguration Day is shown in Figure 1.[2]



*Figure 1.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

---

[2] Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved

intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.  *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.  *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### C.      Stover's Role in the January 6, 2021, Attack on the Capitol

<u>Stover's Travel to Washington and Approach to the Lower West Terrace</u>

Stover travelled by car from his home in Elizabeth, Kentucky, to Washington, D.C., on January 5, 2021, along with two other individuals to attend the "Stop the Steal" rally that the former president was hosting the next day. At the rally, Stover was dressed in a black, hooded Columbia brand rain jacket, a red Trump-branded hat with the former president's signature in silver on the brim, a gray-black knit cap, and brown pants. Stover was also carrying a black backpack. Underneath his jacket, Stover was wearing a digital camouflage GXG brand tactical vest.[3] Stover also carried a Sly brand "Profit" paintball face shield, which is a wraparound facemask that protects the eyes, face, and nose and mouth area from projectiles.[4] Stover's face shield was customized with a row of hand-painted teeth that stretched across the mask's mandible shield.

Stover became separated from his travelling companions during the rally. Shortly after the

---

[3] This vest is intended for use during paintball, has numerous pouches and pockets, a built-in hydration system, and is also padded with foam to protect the wearer from the impact of paintballs. *See* "Deluxe Tactical Vest" *available at* https://gxgsports.com/products/deluxe-tactical-vest-black#shopify-product-reviews.

[4] *See* "Sly Paintball Mask Profit Series" *available at* https://ansgear.com/sly-paintball-mask-profit-series-olive/

former president finished speaking, Stover began moving from the 1600 block of Constitution Avenue in the direction of the Capitol. *See* Gov. Ex. 1.[5] Stover approached the Capitol from the west. As he was making his approach Stover would have heard the sounds of the riot that was already starting to rage on the West Front and been aware of the measures that the officers there were using to try and protect the building, including sirens, concussive devices detonating, pepper spray, and loudspeakers ordering the crowd to disperse.

As Stover was making his final approach to the West Front of the Capitol, a series of events happened there in rapid succession. At 2:08 p.m., the mob breached the Northwest Stairs, giving them access to the Northwest Courtyard and the path to the Senate Wing Door, which was itself breached five minutes later at 2:13 p.m. At 2:28 p.m., rioters overwhelmed the police line in the West Plaza. Between 2:28 p.m. and 2:41 p.m., the officers on the West Front retreated up the West Stairs to the Lower West Terrace and ultimately into the Lower West Tunnel. At the same time, the mob also continued up the West Front in pursuit of the retreating officers with some rioters assaulting the officers as they retreated.

Inside of the Lower West Tunnel, officers secured a set of glass doors to prevent entry into the tunnel by the rioters. At 2:42 p.m., rioters began to break through the locked glass doors that the officers had secured. From behind a second set of swinging doors, the officers watched as the

---

[5] In Gov. Ex. 1, the song "Tiny Dancer" by Elton John can be heard playing. This song was played three times in the vicinity of the Ellipse during the rally, including four minutes after the former president finished speaking at 1:11 p.m. Based on the mass movement of the crowd towards the Capitol in Gov. Ex. 1, the government has determined that this exhibit captures the third time that "Tiny Dancer" played at the rally, which places the timing of Gov. Ex. 1 at approximately 1:16-1:18 p.m. *See also* C-SPAN, "Trump's Jan. 6 Rally Speech" available at https:///www.c-span.org/video/?50744-1/trumps-jan-6-rally-speech, at 4:42:39-4:49:56.

glass separating them from the rioters shattered and the rioters were able to advance further into the Lower West Tunnel. From there, one of the most violent and prolonged confrontations between rioters and police on January 6 occurred. Twelve minutes after the first rioters smashed the glass doors in the tunnel, Stover joined the fray on the Lower West Terrace.

<u>Stover's First Entry into the Lower West Terrace Tunnel</u>

By 2:53 p.m., Stover had joined the rioters on the Lower West Terrace and was near the tunnel entrance. On the Lower West Terrace, Stover had turned his Trump-branded hat around and pulled his Sly face shield on to his head such that it was balanced on his forehead with his face still exposed. *See* Figure 2; *see also* Gov. Ex. 2 at timestamp 59:22.



*Figure 2.*

Starting at approximately 2:54 p.m., Stover, from his vantage point on the Lower West Terrace, started chanting "Whose House? Our House!" From this same position, he watched as rioters pulled police riot shields from the officers in the tunnel and began passing them back into

the mob. *Id.* at 59:22-59:32. Stover then began to assist the mob's efforts to overcome the officers in the tunnel by passing a red pylon into the tunnel. *See* Figure 3.



*Figure 3.*

Starting at 2:56 p.m., fourteen minutes after rioters smashed the glass doors in the tunnel, a group of rioters in the tunnel called the crowd behind them forward. Stover answered their call and, at 2:57 p.m., advanced into the tunnel. *See* Figure 4; *see also* Gov. Ex. 3.1 at 08:26-08:40.



*Figure 4.[6]  Stover is circled in yellow.*

From his position near the mouth of the tunnel, Stover peered around the rioter standing immediately in front of him, his codefendant Kyle Kumer, to get a better look at what was happening at the front of the scrum line near the double doors. *See id.* at timestamp 10:15-11:00. Stover also pulled out his phone and began filming the events unfolding in the tunnel. *Id.* At that same time, he also assisted the rioters at the front of the line in the tunnel in their assaults on the officers by passing a stolen riot shield back into the tunnel towards the rioters at the front. *Id.* at timestamp 11:20-11:33.

Stover, after watching the events in the tunnel for approximately five minutes, *see id.*, walked back to the threshold of the tunnel and spoke with David Mehaffie, a rioter who was holding on to the wooden archway that had been constructed around the mouth of the tunnel and

---

[6] Where necessary, images from Gov. Ex. 3.1 and 3.2 have been brightened to better show Stover. No other alterations have been made.

was shouting commands and encouragement to the crowd inside from an elevated position. *See generally United States v. David Mehaffie*, 21-cr-40 (TNM), ECF 526. After speaking with Mehaffie, Stover re-entered the tunnel at 3:03 p.m. and took his prior position in the back of the tunnel. *See* Gov. Ex. 3.1 at 14:38-14:50.

Upon crossing the threshold into the tunnel again, Stover, who was still mostly standing passively in the back, watched as the crowd began one of its first synchronized pushes against the police officers. *See id.* at 14:50-15:15. This method of trying to overwhelm the officers in the tunnel functioned by the rioters rhythmically chanting "Heave! Ho!" and other commands as their signal and, while often locking arms with each other, moving backwards in unison before rocking forward in a synchronized movement. The result was that the officers in the tunnel had to sustain the whole weight of the many rioters moving forward against them at once.

At 3:04 p.m., Stover pulled his Sly face shield over down from his forehead such that it covered and protected his face. *See* Figure 5; *see also* Gov. Ex. 3 at 15:30-15:40.



*Figure 5.*

Stover remained in the tunnel and watched as a group of rioters, who had been at the front of the tunnel scrum-line assaulting police, retreated from the tunnel to allow fresh rioters to come forward. *See id.* at 15:35-16:10. Two minutes later, after briefly lifting up his face shield, Stover advanced into the tunnel towards the police line. *See id.* at 17:25-17:59. From this position closer to the police line in the tunnel, Stover watched as rioters passed three riot shields to the front of the line in the tunnel. As the rioters were passing these shields to the front, Stover would have been able to hear the rioters at the front yelling out "Make a shield wall!", "Lock the shields together!", and—two minutes later—"Push!" *See* Gov. Ex. 5 at 17:55-19:25.

When the rioters pushed their collective weight against this shield wall, they pinned Officer Daniel Hodges between the shield and the door frame. At this moment, with his mask once again down to protect his face, Stover moved to his left and then joined in the rioters' synchronized

13

pushes against the police officers, including the now-pinned Officer Hodges, in the tunnel.[7] *See*

Figure 6; *see also* Gov. Ex. 3 at 20:15-21:20; *see also* Gov. Ex. 5 at 18:55-20:24.



*Figure 6.*

Stover's first synchronized push with the crowd against the police line lasted for

approximately thirty seconds. He retreated to the Lower West Terrace at 3:10 p.m. when the police

---

[7] Officer Hodges later testified about this moment: "It hurt a great deal. It, combined with everything else that was going on, made it difficult to breathe. Being crushed by the shield and the people behind it made me defenseless, injured, made me—contributed to my diminishing senses after the assault, which is why I was calling for help, because I knew maintaining that position and staying upright was untenable. If I was there much longer being assaulted in such a way, I knew that it was very likely I wouldn't be able to maintain my consciousness and become a liability to the other officers." *United States v. McCaughey et al.*, 21-cr-40 (TNM), Trial Tr., 8/30/2022 at 204:12-21. The image of Officer Hodges being crushed in the doorway in the Lower West Terrace tunnel and calling out for help is one of the enduring images of the January 6 assault on the Capitol and is demonstrative of the very real and very serious physical danger that the police officers who defended the Capitol were in.

line began to advance and push rioters from the tunnel. *See* Gov. Ex. 3 at 21:09-21:20.

<u>Stover's Second Entry into the Lower West Terrace Tunnel</u>

At exactly 3:16 p.m., just six minutes after being ejected for the first time, Stover, again with his face shield pulled down to fully protect his face, approached the tunnel again. *See* Figure 7; *see also* Gov. Ex. 3.1 at 26:57-27:04.



*Figure 7.*

For slightly less than a minute, Stover watched from just beyond the threshold of the tunnel as the mob pushed in synchronized movements against the police. *See* Gov. Ex. 3.1 at 27:00-27:39. After checking the fit of his face shield, Stover crossed the threshold and threw his body into the weight of the mob as they collectively pushed against the police officers. *See id.* at 27:40-27:53. Stover, bracing against the two rioters immediately in front of him, pushed with the full force of his body into the rioters ahead of him, and thus contributed to the combined weight and force of the mob that the officers at the head of the tunnel had to resist. *See* Figure 10; *see also* Gov. Ex. 3.1 at 27:34-28:24; *see also* Gov. Ex. 4 at 25:52-26:07.

15



*Figure 8.*

During this time, Stover was an active participant in the mob and its collective assault against the police protecting the Capitol: he followed the start-stop hand signals of the rioters at the head of the tunnel and communicated with the rioters behind him. *See id.* After approximately one minute of pushing with the crowd, Stover had drifted back to the back corner of the tunnel. *See* Gov. Ex. 3.1 at 28:04-28:24. Back in the position that he had been in for his first foray into the tunnel, he lifted his mask and watched as the rioters passed police shields out of the tunnel back to the mass of rioters that had gathered behind them. *See id.* at 29:07-29:25.

At 3:18 p.m., the officers in the tunnel began another push against the rioters to expel them from the tunnel. As the officers were pushing against the crowd, Stover grabbed the framing structure that had been constructed around the tunnel to brace himself and the rioters around him against the officers' efforts. *See* Gov. Ex. 3 at 29:55-30:24. Stover lost his grip on the framing and was pushed down the stairs and back on to the Lower West Terrace at 3:19 p.m. Immediately after being expelled from the tunnel, Stover had a clear view of the assault on Officer Fanone, which

16

took place between 3:18 p.m. and 3:21 p.m.

<u>Stover's Extended Time on the Lower West Terrace and Third Effort Against Officers</u>

Between 3:22 p.m., three minutes after Stover was forcibly ejected from the tunnel, and approximately 3:45 p.m., the situation immediately in front of the tunnel briefly became more static. In this roughly twenty-three-minute window, the rioters who were standing near the threshold of the tunnel were physically engaging with the officers inside of the tunnel less frequently. *See* Gox. 3.1 at 33:30-END; *see also* Gov. Ex. 3.2 at 0:00-15:33. Stover remained in the immediate vicinity of the tunnel during this entire time and was rarely—if ever—more than ten feet from the mouth of the tunnel. *See id.* During this period, Stover was standing immediately next to another rioter as that rioter, after representing that he had spoken with the police at the mouth of the tunnel, announced to the crowd through a megaphone: "We are holding the line; we're not moving until we get our way. Guys, this is a peaceful protest now and it always has been." *See* Figure 9; *see also* Gov. Ex. 6 at 05:01-05:32.



*Figure 9. Stover is circled in yellow. The rioter who made statements to the crowd is in the center holding a megaphone.*

Starting at approximately 3:46 p.m., the crowd outside the tunnel began to advance towards the police officers inside of the tunnel again. Initially, this advance proceeded slowly with the rioters pushing themselves tighter and tighter in against the police line. However, after several minutes of the rioters closing the gap, the front-line rioters were pressed directly against the police line. Officers tried to push back against the encroaching rioters but were overwhelmed by the sheer force of numbers and weight of the crowd. During this period of rising interaction and tension, Stover—once again with his mask pulled down to cover his face—was in the second row of rioters as they started pushing and agitating against police. *See* Gov. Ex. 3.2 at 16:30-17:11. In response to the officers' efforts to push them back and prevent them from entering the tunnel, the rioters once again employed acts of violence and coordinated pushing.

Between 3:46 p.m. and approximately 3:49 p.m., the situation at the mouth of the tunnel

18

continued to escalate. An officer at the front of the line began to experience the effects of being crushed between the increasing pressure of the rioters and the officers behind him trying to keep the rioters from entering the tunnel. *See id.* at 17:44-18:29. The crowd of rioters, taking advantage of the fact that this officer needed to be removed from the front of the line, pressed harder into the tunnel, *id.*, and the officers in the tunnel attempted to resist the rioters' efforts. By 3:48 p.m., the synchronized pushing against officers began again with the officers having to hold back the entire weight of the crowd pushing against them at once. *Id.* At this moment, and as the officer was being pulled back from the line by other officers in the tunnel, Stover grabbed the wooden frame that had been built around the edge of the tunnel and hoisted himself up. *See* Figure 10; *see also* Gov. Ex. 3.2 at 18:24-18:45.



*Figure 10. Stover is circled in yellow. The officer who had to be
evacuated to the back of the line is circle in blue.*

From his elevated position, Stover was able to watch as the officer had to remove his gas mask and as he was pulled back to the rear of the police line in the tunnel. *See id.* at 18:50-19:34.

At 3:50 p.m., the crowd, including Stover, began rocking back and forth against the line of police officers. *Id.* at 20:35-20:56. Stover again grabbed the wooden framing around the tunnel and used it to leverage his pushes against the police officers and maximize his force. *Id.* at 20:56-21:09.

As the crowd concluded its push, a rioter who was positioned to the back-left of Stover, produced a stolen police MK-46 chemical spray device. This rioter then began spraying a stream of chemical irritant into the huddled police officers. *Id.* at 21:16-21:35. An officer near the front responded by spraying a return stream of chemical spray. *Id.* at 21:34-21:39. Stover, seeing the officer spraying into the crowd of rioters at the mouth of the tunnel, braced himself against the framing of the tunnel yet again, pulled himself up, and reached to grab the officer's canister of chemical spray. *Id.* at 21:42-21:51. As he brought his hand down after reaching, Stover struck an officer on the top of the riot helmet, causing the officer's head to be knocked backward. *See* Figures 11a-11d; *see also* Gov. Ex. 3.2 at 21:42-21:48.



*Figures 11a-11d (Left to right; top to bottom).*

Stover remained in his position on or near the wooden framing for approximately three more minutes. During this time, he participated in more synchronized pushing and grabbed at other officers inside of the tunnel. *Id.* at 21:52-24:23.

At 3:54 p.m., other rioters, including one armed with a baton, began climbing over and on top of Stover. *See id.* at 24:22-24:55. This group of rioters—who were, in effect, crowd-surfing on top of the other rioters at the mouth of the tunnel—used batons, flag poles, and sticks against officers in the tunnel; some also suspended themselves over the officers by hanging on the wooden frame, where they launched downward attacks on the officers in the form of kicks and strikes with flagpoles and other improvised weapons. *Id.* at 24:55-27:32. Despite seeing at least some of these increasingly violent attacks on the officers, Stover still did not leave the area of the tunnel. Instead, he continued aiding the rioters by passing riot shields up to the skirmish line and one of those

21

shields to protect at least one of the rioters who had just climbed over him to assault police. *Id.* Stover was immediately next to the mouth of the tunnel as rioters struck officers with batons, flag poles, and other weapons. He watched as rioters passed shields up to the skirmish line and used them to protect the rioters from the police officers' efforts to resist them. For more than ten minutes, Stover stood there watching officers in the tunnel being repeatedly assaulted. Then, at just after 4:09 p.m., Stover was sprayed in the face by chemical agents and finally left the area around the mouth of the Lower West Terrace tunnel. *See* Figure 12.



*Figure 12.*

Some time after being ejected from the tunnel for the final time, Stover walked down the Capitol into the West Plaza. As the sun was beginning to set, he took off his paintball mask and face shield to reveal the paintball padding that he wore underneath his jacket and walked back through the West Plaza. *See* Figure 13.



*Figure 13.*

### III.    THE CHARGES AND PLEA AGREEMENT

On September 13, 2023, a federal grand jury returned a superseding indictment charging Stover with four counts, including, civil disorder in violation of 18 U.S.C. § 231(a)(3). On, January 31, 2024, Stover was convicted of a violation of 18 U.S.C. § 231(a)(3) based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Stover now faces sentencing on one count of civil disorder. As noted by the Presentence

Report issued by the U.S. Probation Office, the defendant faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That Guidelines analysis, as set forth in the plea agreement letter and PSR in this case, is:

**Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact." |
| Total | 13 | |

The U.S. Probation Office calculated Stover's criminal history as category II, which is not disputed. PSR ¶ 63.[8] Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Stover's Guidelines imprisonment range is 10 to 16 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that, except for his criminal history category, mirrors the calculation contained herein.

---

[8] In the plea agreement, the Government estimated Stover Criminal History Category to be I. However, the Probation Office calculated his Criminal History Category to be II. After reviewing the PSR, the Government concurs with the Probation Office that he is correctly determined to be Category II based on the underlying facts of his September 2019 conviction for disorderly conduct, as well as the length of his term of probation for that conviction. *See* U.S.S.G. § 4A1.2(c)(1).

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

Stover's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Stover, who came to the Capitol prepared for violence, spent more than an hour inside of the restricted perimeter. During that hour, he was in the immediate vicinity of the Lower West Terrace tunnel where he saw numerous officers be assaulted and pushed to the physical brink as they tried to keep the rioters from breaching the Capitol through the tunnel. Stover personally entered the tunnel three times. Each time, he joined the rioters in their efforts to overwhelm the officers.

Moreover, Stover came to Washington prepared for violence. The face shield and chest padding that he wore are specifically designed to protect the face and chest in a sport that simulates combat. Stover carried these items with him or wore them underneath his jacket so that when the time came to violently riot against police officers, he was ready to don them as protection against any force that might be used against him. He engaged in planning and premeditation to maximize his potential disruption to the peaceful transition of power. Stover's crime was not a crime of opportunity: he came prepared for violence and, when the time came to do so, put on his protective gear and engaged with the police. The nature and circumstances of Stover's violent conduct in the

Lower West Terrace tunnel and the preparation that he made so that he could effectively engage in that violent conduct support a fourteen month term of incarceration.

### B.  The History and Characteristics of the Defendant

Stover owns his own carpeting business, possesses a GED, and has prior criminal convictions. In June 2013, he was convicted of possessing a synthetic cannabinoid product, a misdemeanor, and given a two-year suspended sentence to 120 days of incarceration. PSR ¶ 61. In November 2019, in connection with an altercation with security personnel at a concert, he was convicted of disorderly conduct and sentenced to a 30-day conditional discharge and two years of unsupervised probation. PSR ¶ 62. The defendant has also accumulated numerous traffic violations, including some involving second or repeated offense conduct. *See* PSR ¶¶64-68.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. He has a pattern of disregarding the orders of law enforcements, as exemplified by the 2019 incident in which he got into a physical altercation with security personnel as they tried to eject him for disorderly behavior at a concert. Even his traffic offenses, in which he has a clear pattern of refusing to abide by laws and traffic regulations, are indicative of this pattern. Stover is not someone who recognizes law, authority, or those who give lawful orders, and this pattern of behavior continued at the Capitol when he spent more than an hour trying to break through a police line. A fourteen-month sentence is appropriate so that he can understand that this behavior is unacceptable and that the law applies to him equally as it does to everyone else.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration. Stover's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 6/9/2023 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."). Stover, as one among many in this mob, attacked the seat of government and one of the foundational principles of our republic. His crime was of the utmost seriousness and should in no way be minimized or distorted.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration. Stover is different from many other January 6 defendants simply because of the protracted time that he spent on the Lower West Terrace, his decision to enter the tunnel on the Lower West Terrace *three* times in less than an hour, and the fact that—each time he entered the tunnel—he physical engaged with law

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

enforcement to try and breach the Capitol. Stover was not dissuaded by being pushed from the tunnel once or even twice; it took three expulsions from the tunnel and a blast of chemical spray directly to his face to stop his pattern of conduct in the Lower West Terrace tunnel. Put simply: Stover is not a person who is easily deterred by laws or lawful orders, as he has repeatedly engaged in unlawful and—often—repeated conduct under the apparent belief that laws and regulations do not apply to him. This pattern holds true in his criminal record all the way through January 6. A fourteen-month sentence would provide Stover the specific deterrence he so badly needs to prevent him from engaging in this type of criminal conduct again.

## E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. In both of these cases, the defendants pled to the sole count of a violation of 18 U.S.C. § 231(a)(3).

In *United States v. Narayana Rheiner*, 22-cr-108 (DLF), the defendant walked to the Capitol after attending the "Stop the Steal" rally. At the Capitol, he entered the secure perimeter and engaged with officers on the West Front of the Capitol. Rheiner, like Stover, was present at the Capitol and engaging with police officers for nearly an hour. Like Stover, Rheiner made his way to the front of the line of rioters and engaged with police officers both directly and physically. As with Stover, Rheiner was involved with the taking of police riot shields, but, unlike Stover, Rheiner physically wrestled an officer's shield from him and caused him to fall from to the ground and down a short set of stairs. Both Stover and Rheiner entered the Capitol but Stover's entrance was limited to the tunnel. Inside of the Capitol, Rheiner continued to confront, harass, and verbally accost officers, and—in one instance—pushed his body right up to an officer and refused to move back when he was instructed and then physically pushed back. Both Stover and Rheiner physically engaged with multiple officers and interfered with their efforts to secure the Capitol, but Stover's three instances of interference were more persistent and spread out over a longer period than Rheiner's. Like Stover, though, Rheiner had a criminal history, but his criminal category history

was IV rather than Stover's II. Unlike Stover, Rheiner did not wear protective gear. Judge Friedrich sentenced Rheiner to fifteen months of incarceration.

In *United States v. Roger Baugh*, 22-cr-313 (JEB), the defendant travelled to Washington for the "Stop the Steal" rally and then, after the rally, walked to the Capitol. After entering the secure perimeter, Baugh went up to the Lower West Terrace tunnel. Baugh, like Stover, waited outside the tunnel initially to observe what was happening before injecting himself into the tunnel. After seeing what was happening in the tunnel, Baugh, like Stover, responded to the call of other rioters for help and joined in the coordinated pushing against officers. At certain points, Baugh and Stover were actually in the tunnel together participating in the same pushes. Baugh, like Stover, retreated from the tunnel after a short time, but, also like Stover, re-entered the tunnel minutes later. Back inside of the tunnel, Baugh again joined in the coordinated efforts to overwhelm officers. Unlike Stover, Baugh did not wear a protective face covering—and instead used a scarf—or protective chest covering. Stover, unlike Baugh, entered the tunnel for a third time and made direct physical contact with officers. Unlike Baugh, Stover was present inside and in the vicinity of the Lower West Terrace tunnel for more than an hour. Stover's wearing protective gear, third entrance into the tunnel, and his direct physical strike on an officer make his conduct, on the whole, worse than Baugh's. Judge Boasberg sentenced Baugh to twelve months and one day of incarceration.

Stover's conduct is like these cases in important ways, but it is also worse than these cases in important ways. Perhaps most importantly, neither Baugh's nor Rheiner's cases involved the persistence that Stover showed at the Capitol. Stover made three distinct efforts to breach the

tunnel and, in each instance, joined in the mob's efforts to overwhelm the officers in the tunnel. Stover engaged in this conduct after initially watching what was happening the tunnel for several minutes. Stover, even when he was not directly engaging in the mob's assaults on these officers, watched egregious assaults against police officers unfold sometimes mere inches from his face with the perpetrator literally standing on top of him as he assaulted officers. Despite knowing full well the violence against police that was occurring in and around the tunnel, Stover did not leave the area. Stover's extremely purposeful and deliberative conduct, for which he prepared by bringing protective gear, was spread out over the course of more than an hour. These comparator sentences show that a sentence of fourteen months is appropriate and will not cause unwarranted sentencing disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Stover must pay $2,000 in restitution, which reflects in part the role that he played in the riot on January 6.[13] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Stover's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 151.

---

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of fourteen months of incarceration, thirty-six months of supervised release, and $2,000 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

KAITLIN KLAMANN
Assistant United States Attorney
Illinois Bar No. 6316768
601 D Street NW
Washington, D.C. 20530
Kaitlin.klamann@usdoj.gov