**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-237-3** |
| **KYLE KUMER** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kyle Kumer to 15 months' incarceration, a term of three years of supervised release, $2,000 in restitution, and a $100 special assessment.

## I.     INTRODUCTION

The defendant, Kyle Kumer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Kumer, a former church minister, traveled with his seventy-one-year-old mother to Washington, D.C. from Kansas City, Missouri. Kumer and his mother then joined the large crowd that marched to the U.S. Capitol. They stood and watched as the riot broke out on the West Plaza and as rioters pulled down barricades and attacked the police. Instead of turning around, Kumer led his mother further into the chaos, eventually making their way up to the Lower West Terrace "tunnel" where rioters were violently attacking the police. Not content with watching from the Inaugural Stage, Kumer and his mother pushed into the tunnel where they remained for almost 25 minutes. During this time, Kumer joined the rest of the crowd in the tunnel and pushed in unison against the police line. At one point, as he pushed hard with his back toward the police, he called out encouragement to other rioters, saying, "LET'S GO! C'MON! LET'S GO!" Kumer and his mother were two of the last people pushed out of the tunnel by the police at this time, and even after he was removed from the tunnel, Kumer remained on the Inaugural Stage near the police line for several more minutes.

The government recommends that the Court sentence Kumer to 15 months of incarceration. A 15-month sentence reflects the gravity of Kumer's conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 16, for

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.    Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building**

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. "Inauguration at

the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction

and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

### C.  Kyle Kumer's Role in the January 6, 2021 Attack on the Capitol

Kyle Kumer and his mother traveled from Kansas City, Missouri to Washington D.C. on January 5, 2021. They attended the Stop the Steal Rally at the Ellipse and then joined the large crowd and marched to the U.S. Capitol. By approximately 2:30 p.m., Kumer and his mother had advanced through the huge crowd all the way to the police line at the West Plaza. As the riot erupted around them and police officers attempted to defend the building and grounds, Kumer clutched his mother and took a series of selfies of himself and the police line behind him.



*Image 1: Still Image from MPD Body-Worn Camera of Kumer on the West Plaza Taking a Photograph of the Capitol and the Police Line*



*Image 2: Still Image from MPD Body-Worn Camera Footage Showing Kumer Taking a Selfie on the West Plaza with the Police Line Right Behind Him*

The crowd on the West Plaza surged forward shortly after Kumer took these photographs and again began to push the police back. Kumer and his mother remained at the front of that crowd. Police officers attempted to push them back, but Kumer and his mother resisted. *See* Exhibit A, MPD body-worn camera footage beginning at timestamp 14:32:07.[2]

---

[2] The government will provide the Court and the defense with copies of its sentencing exhibits via USAfx prior to the sentencing hearing.



*Image 3: Still Image from Exhibit A of Kumer and his Mother at the Front of the Crowd on the West Plaza and Pushing Up Against Officers*

When the police line on the West Plaza was overrun shortly thereafter and the police had to retreat to the Lower West Terrace, Kumer and his mother followed them. They made their way up to the Inaugural Stage and joined the large crowd gathering outside the tunnel. As Kumer and his mother waited for their turn to file into the tunnel, Kumer joined a loud chant led by other rioters, calling out "WHOSE HOUSE?! OUR HOUSE!" as he pumped his fist. *See* Exhibit B, open-source video.



*Image 4: Still Image from Exhibit B at Timestamp 00:13 of Kumer Outside the Entrance to the Tunnel Chanting "WHOSE HOUSE?! OUR HOUSE!"*

In fact, as Kumer and his mother walked up the steps to the tunnel, a person nearby used a megaphone to call out, "THE DOORS ARE OPEN! WHOSE GOT BODY ARMOR?!" *See* Exhibit C, open-source video at timestamp 00:15. Kumer moved up the stairs and toward the tunnel as this call was made. Similarly, as he waited on the stairs, Kumer saw rioters inside the tunnel hand out multiple police riot shields to the crowd and even reached out and attempted to grab a shield to help hand it out to the crowd. *See* Exhibit D, open-source video at timestamp 00:11.

After waiting for their turn to enter the tunnel for several minutes, Kumer and his mother finally pushed into the tunnel itself at approximately 2:56 p.m. and Kumer wasted no time in immediately taking a picture. *See* Exhibit E, CCTV footage at timestamp 2:56:48.



*Image 5: Still Image from Exhibit E of Kumer's Entrance Into the Tunnel*

Kumer and his mother moved to the south wall of the tunnel and pushed up closer to the police line. They remained there for several minutes despite various opportunities to leave when the crowd in the tunnel thinned out. For example, at approximately 2:57 p.m., several rioters rushed out of the tunnel and back onto the Inaugural Stage, but Kumer and his mother remained. *See* Exhibit E.

At approximately 3:04 p.m., the rioters in the tunnel organized and began to push in a rocking motion against the police line, calling out "HEAVE! HO!" as they did so. Kumer joined this group push effort, turning his back to the police line and pushing against the rioters in front of him. *See* Exhibit E beginning at timestamp 3:04:00. At approximately 3:05 p.m., it appears that Kumer and his mother were in the pathway of OC spray deployed by the police line, but still they remained in the tunnel. *Id.* at timestamp 3:05:08. At approximately 3:07 p.m., rioters in the tunnel called out for a "shield wall" to be made against the police line and several stolen riot shields were

handed up to rioters at the front who put them together to push against the police. *Id.* beginning at timestamp 3:06:45. Kumer and his mother remained in the tunnel as the other rioters built the "shield wall."

At approximately 3:08 p.m., Kumer joined a second "heave ho" attack on the police. *Id.* beginning at timestamp 3:08:35. He turned his back to the police line and the rioters in front of him and pushed against the rioters in front of him on cue. While he pushed, he called out loudly to other rioters, "PUSH!!!" and "LET'S GO!! C'MON!!" *See* Exhibit F beginning at timestamp 00:18.



*Image 6: Still Image from Exhibit F at Timestamp 00:31 of Kumer in the Tunnel*

About two minutes later, many rioters were pushed out of the tunnel by the police, but

Kumer and his mother stayed. At approximately 3:12 p.m., another "heave ho" push began in the tunnel and Kumer enthusiastically joined for a third time. During this group push, MPD Officer Daniel Hodges was crushed between the frame of one of the doors in the tunnel and the crowd, including a rioter who was pressing up against him with a stolen riot shield. *See* Exhibit G, open-source video.



*Image 7: Still Image from Exhibit G at Timestamp 1:55 of Officer Hodges Pinned in Door*

Shortly after the heave ho that resulted in injury to Officer Hodges, many rioters rushed out of the tunnel. But Kumer and his mother remained. In fact, at approximately 3:14 p.m., Kumer took a photograph of the police line in the tunnel.



*Image 8: Still Image from Exhibit E of Kumer Taking a Photograph of the Police*

Approximately one minute later, at 3:15 p.m., Kumer joined a fourth "heave ho" push against the police line. Exhibit E beginning at timestamp 3:15:45; Exhibit H.



*Image 9: Still Image from Exhibit H at Timestamp 00:02 Showing Kumer Pushing in "Heave Ho"*

Two minutes later, at approximately 3:17 p.m., a fifth "heave ho" push began and Kumer, once again, joined in. *See* Exhibit E beginning at timestamp 3:16:45. Finally, at 3:18 p.m., the police gained momentum and pushed all of the rioters out of the tunnel. *See* Exhibit E beginning at timestamp 3:18:20. Kumer and his mother were two of the very last people to leave the tunnel at this time. *See* Exhibit I beginning at timestamp 00:02.



*Image 10: Still Image from Exhibit I Showing Kumer as He was Pushed Out of Tunnel*

Kumer then stayed near the police line at the Lower West Terrace for several more minutes. For example, after Officer Fanone was dragged into the crowd and as he made his way back to his fellow officers at the tunnel, Kumer was there and Kumer reached out and touched Fanone. *See* Exhibit J, open-source video at timestamp 00:20. Additionally, while standing near the police line, another rioter grabbed the riot shield of a police officer. Kumer also grabbed the shield before the rioter ripped it away from the police officer and into the crowd. *Id.* at timestamp 00:35.

### D.    Injuries to Officer Hodges from Kumer's Heave Ho Pushes

At least one officer was injured from the "heave ho" pushes that Kumer participated in: MPD Officer Daniel Hodges. As he described in a recent trial, "The strength - - the force of the people trying to attack us and make their way into the Capitol had me pinned against the door frame…. As I'm pinned, my arms are functionally useless. I can't move them. And I'm pinned in

15

such a position that I can't get any functional strength from my legs. So I was very vulnerable at that moment." Exhibit K at 199:5-7; 200:18-21. Officer Hodges described the pain he suffered when he was crushed in the door frame, saying, "It hurt a great deal. It, combined with everything else that was going on, made it difficult to breathe. Being crushed by the shield and the people behind it made me defenseless, injured, made me - - contributed to my diminishing senses after the assault, which is why I was calling for help, because I knew maintaining that position and staying upright was untenable. If I was there much longer being assaulted in such a way, I knew that it was very likely I wouldn't be able to maintain my consciousness and become a liability to the other officers." *Id*. at 204:12-21. Officer Hodges testified that his injuries from that day included "pain and bruising about my entire body, a large contusion on the top of my head … busted mouth, bleeding, lacerations, swollen hand, just generalized pain." *Id.* at 209:6-12. He also testified that he sought medical treatment for these injuries the following morning. *Id.* at 211:2-5.

### E.    Kumer's Interview with the FBI

Kumer was interviewed by the FBI on November 17, 2021. Among other things, he told the FBI that he and his mother arrived at the rally in Washington, D.C. on January 6, 2021 after the rally was over. Kumer stated, "At least what my experience was, was that this was a peaceful event until I hit that alcove [the tunnel]." Kumer claimed that when he got up the stairs that led to the tunnel and a man in black tactical gear told him, "don't go in there, it's not a place for good people." Kumer told the FBI that he didn't know what the man was talking about at that time because "clearly there was nothing happening in there." Kumer told the police that when he arrived inside the tunnel, "there was no conflict." He said that he and his mother just "drifted in" like it

was a concert and that he in no way intended to hurt any police officers. Kumer also told the FBI that he saw "that police officer who got his face smashed [Officer Hodges]." Kumer also claimed that while he was in the tunnel, he was just trying to get him and his mother away from the police. He claimed the purpose of his pushing in the tunnel was to get people away from his mother.

###    F.    Kumer's Social Media Posts After January 6

Kumer posted about his experience on January 6, 2021 on his Facebook page. Specifically, he posted a long status on January 6th claiming the events at the U.S. Capitol were "Passionate, Forthright, Bold" and that the crowd was "largely self-regulated." *See* Exhibit L.  Kumer also posted photographs and at least one video from January 6 to his Facebook page before later removing them. *See* Exhibit M.

###    G.    Search of Kumer's Cellular Phone

After he left the U.S. Capitol, Kumer texted multiple people about the riot. In these messages, Kumer was at times honest about his experience, at times exaggerating his experience and at times minimizing or even spreading misinformation about the events that day. His texts included the following statements:

- "See all those unguarded windows that could have been easy entry points."
- "See all the windows that were NOT broken into that were unguarded entry points"
- "We latterly in the very front"
- "2 people in front of me ran in and were shot"
- "The national guard couldn't have stopped the croud they were already overwhelmed …"
- "Yes we were waved in"
- "We got pepper sprayed more than once"
- "We were respectful and left when it started to devolve"

- "We were inside"

- "I think God was honored by our hearts and actions today"

- "Had the whole experience blinded by pepper spray for 15+ mins, dry heaving.."

- "The short of it was me and my 71yr mom and I walked into one of the sets that was later shown in the 2nd Trump impeachment trial. Soon after we walked into the hallway leading to the doorway of the back of the Capitol building. A camera crew, boom stand w light + a second mic arrived. After the camera crew was in place guys w all black tactical gear (like the camera guy shown in left corner) yelled for everyone to get in here and than they pushed us from behind into the National Guard."

- "We did not go in. We hung onto a side handrail while the agitators created the video to misrepresent the event"

- "While in this hallway I did hear [sic] the gun shots from within the building"

- "In the video I shared w you there is a main small doorway to the building. Somehow my mom drifted into this area"

- "As we walked into the hallway a guy in black swat gear ran up to us and very forcefully stated don't go in there "let the men do the lifting""

- "It was a hallway to the front doorway. We never went IN but we went TO the doors"

- "I believe it was a media set up to get a scene that may not have worked out"

- "My best guess was it was a set up by the media for news clips but this was the focal point of the rally"

The FBI also identified only three photographs that Kumer took on January 6 on his phone, including the below which matches open-source video discussed above depicting Kumer taking selfies near the police line on the West Front.



*Image 11: Photograph from Kumer's Cellular Phone*

In addition to the three photographs, there were several other "thumbnail" photographs on his phone, indicating that Kumer had deleted the original images. These thumbnails included additional photographs of the West Front, police officers, and the small staircase where Kumer likely climbed from the West Plaza to the Inaugural Stage. In fact, Kumer also had a video on his phone showing that doorway with the West Plaza covered in rioters chanting "U-S-A!" *See* Exhibit N.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 13, 2023, a federal grand jury returned a superseding indictment charging Kyle Kumer (along with four co-defendants) with four counts, including civil disorder and aiding and abetting. On, January 31, 2024, Kumer was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Kumer now faces sentencing on civil disorder and aiding and abetting.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government disagrees with the Guidelines calculation in the PSR. Namely, it believes that a two-level increase pursuant to U.S.S.G. § 2A2.4(b)(2) should be added for causing bodily injury to a victim, MPD Officer Hodges. The Guidelines define "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1 cmt. n. 1(B). Bodily injury results in a two-point enhancement under the Guidelines, unlike "serious bodily injury" which results in a five-point enhancement under the Guidelines or "permanent or life-threatening bodily injury" which results in a seven-point enhancement under the Guidelines.

As set out above, Officer Hodges experienced significant pain as a result of being crushed from the crowd during one of the heave-ho pushes in which Kumer participated. He had difficulty breathing, was being crushed and was in danger of losing consciousness. He suffered contusions and bruising throughout his body and experienced generalized pain. He also sought medical treatment the following morning for these injuries. Being pinned against a door so painfully that it caused Officer Hodges to cry out as he did, there can be no question that he experienced bodily

injury. *See* Mem. Op., *United States v. Easterday,* 22-cr-404 (JEB), ECF No. 111 at 15-18 (D.D.C. Apr. 8, 2024) (surveying definitions of "bodily injury" across statutes and endorsing idea that "bodily injury," as used in 18 U.S.C. § 111(b), includes "'physical pain' without any temporal requirement, as well as 'any other injury to the body, no matter how temporary.'") By the time of this push, Kumer had been present inside the tunnel for over 15 minutes, he had seen the line of police officers in the tunnel and he knew that he and others were pushing forcefully against them. In fact, during his interview with the FBI, Kumer admitted that he had seen Hodges. It was reasonably foreseeable under these circumstances (if not Kumer's explicit purpose) that a police officer would be injured as a result of his actions; the whole point of the collective push was to break the police line guarding the Capitol. Therefore, the enhancement should apply.

The government believes that the correct Guidelines calculation is as follows:

Count Two: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense Involved Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Victim Sustained Bodily Injury | +2 |
| | **Total** | **15** |
| **Acceptance of Responsibility:** | | **-2** |
| **Total Offense Level:** | | **13** |

*See* Plea Agreement at ¶ 6.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who

have no criminal history points and who meet certain additional criteria. As set out in the plea agreement, the parties agree that 4C1.1 is inapplicable here.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 65. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 13, Kumer's Guidelines imprisonment range is 12 to 18 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Kumer's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Kumer witnessed the eruption of the riot on the West Plaza and the violence against the police before he even decided to go up to the Inaugural Stage and enter the Lower West Terrace tunnel. Inside the narrow tunnel, Kumer enthusiastically joined at least five separate push efforts against the outnumbered police during the almost twenty-five minutes he was there, one of which resulted in bodily injury to MPD Officer Hodges as he was pinned against a doorway and, in one of the most searing images from the day, causing him to scream out in pain and fear. And Kumer did all of this with his 71-year-old mother in tow. Kumer was also dishonest with the FBI when he was interviewed, claiming that he didn't participate in any violence

against the police and, in fact, that he didn't observe any conflicts of any kind against the police. After January 6, Kumer spread lies about the riot, including claims that it was peaceful and a set-up. The nature and circumstances of Kumer's offense were of the utmost seriousness, and fully support the government's recommended sentence of 15 months' imprisonment.

**B.  The History and Characteristics of the Defendant**

Kumer is a former church minister who now owns and operates a silkscreen printing business. PSR ¶ 96-97. He's 44 years old. He was raised in a stable home free of abuse, poverty and neglect. PSR ¶¶ 76-78.

As a former church minister and middle-aged adult, Kumer was a in a position of trust within his community, and he should have known better than to participate in a violent riot that threatened the peaceful transfer of power. He should have known better than to place his 71-year-old mother in an extremely dangerous situation where she easily could have been injured. And the lies he spread afterward, claiming that the rioters were "respectful" and "waved in," were all the more damaging based on his position in the community.  Kumer had many choices and opportunities other than to commit his crimes on January 6, 2021, but he chose to go to the U.S. Capitol, he chose to stay when violence erupted, he chose to participate in violent acts against police, and he chose to lie and boast about it afterward.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Kumer's criminal conduct on January 6 was the epitome of disrespect for the law. Not only did Kumer engage in a prolonged fight that injured police in the tunnel, but he was also dishonest with law enforcement about his participation and dishonest with the public about the nature of the riot. A sentence of 15 months' incarceration will reflect the seriousness of his crimes and promote respect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Kumer made intentional decisions to place himself and his own 71-year-old mother in the middle of violent riot on January 6. As discussed above, from communications Kumer exchanged after the riot, it appears he felt no remorse for his

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

actions and continued to perpetuate lies about the riot. His prolonged and repeated pushes against the police in the tunnel, his lies to his friends and family about the riot, and his dishonest statements to the FBI all suggest that he is at a higher risk of recidivism and requires a sentence of incarceration to accomplish the goal of specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and

consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Shawn Price*, 22-CR-106 (CJN). Price pushed against fellow rioters who pushed up against the police line on the West Plaza. Price interfered with officers on at least two different occasions on the West Plaza within the span of approximately five minutes. After January 6, like Kumer, Price also bragged on Facebook about his actions, and minimized his conduct in an interview with the FBI. Price pleaded guilty to a violation of 18 U.S.C. § 231(a)(3) through a plea agreement with the government. This Court sentenced him to 12 months' incarceration. Kumer's 25 minutes in the tunnel (in contrast to Price's five) and five separate push efforts (in contrast to Price's two) against the police line warrant a greater jail term of 15 months' incarceration.

*United States v. Roger Baugh*, 22-CR-313 (JEB). Like Kumer, Baugh passed visible signs noting the U.S. Capitol was closed and saw rioters assaulting, hitting, and throwing objects at the police officers before reaching the tunnel. After entering the tunnel, Baugh engaged in several heave-ho pushes against the police like Kumer. Baugh was also dishonest with the FBI. Baugh

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

pleaded guilty to a violation of 18 U.S.C. § 231(a)(3) and had a Guidelines range of 8 to 14 months. Judge Boasberg sentenced Baugh to 12 months and 1 day's incarceration, near the top of the Guidelines range.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kumer must pay $2,000 in restitution, which reflects in part the role Kumer played in the riot on January 6.[7] Plea

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Kumer's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 138.

## VIII.   FINE

The defendant's convictions for a violation of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). The Guideline fine range is $4,000 to $40,000. In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable to pay a fine. PSR at ¶113.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 15 months' imprisonment, three years of supervised release, restitution in the amount

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of $2,000, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Kaitlin Klamann*
        KAITLIN KLAMANN
Assistant United States Attorney
Illinois Bar No. 6316768
601 D Street NW
Washington, D.C. 20530
Kaitlin.klamann@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov