**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-237 (CJN)** |
| **JAY JAMES JOHNSTON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its sentencing memorandum in the above-captioned case. For the reasons set out herein, the government requests that this Court sentence Jay James Johnston to 18 months' incarceration—at the midpoint of the applicable Guidelines range of 15 to 21 months—three years' supervised release, $2,000 in restitution, and a $100 special assessment.

## I.  INTRODUCTION



*Image 1: Photograph of the defendant, Jay James Johnston, dressed as Jacob Chansley, "the QAnon Shaman" at a Halloween party approximately two years after participating in the January 6, 2021 riot at the United States Capitol*

1

The defendant, Jay James Johnston, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Johnston, an actor from Los Angeles, California, flew to Washington, D.C. on January 5, 2021, to attend the Stop the Steal Rally. On January 6, 2021, he attended the rally and then marched to the U.S. Capitol. After arriving on the West Plaza, Johnston stood near the police line watching and filming rioters attack police on his phone. When police on the West Plaza were forced to retreat, Johnston followed them up to the Inaugural Stage and into the Lower West Terrace "tunnel." Johnston was inside the tunnel for approximately 10 minutes. During that time, he: (1) helped at least four other rioters wash their eyes out after being sprayed with OC spray; (2) used a stolen United States Capitol Police riot shield to make a "shield wall" against the police inside the tunnel; and (3) participated in "heave-ho" push that pinned and crushed MPD Officer Daniel Hodges against a door frame. After Johnston left the tunnel, he stayed on the Inaugural Stage for

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

two more hours and filmed numerous videos of rioters attacking the police. Despite his clear knowledge of, and participation in, the violence used by rioters that day, Johnston sent messages to friends and family in the days after January 6th claiming the events at the U.S. Capitol were exaggerated by the media and that it was a "setup" by the police and Antifa. Finally, almost two years after the attack on the Capitol, Johnston made light of his participation in the riot by dressing up as Jacob Chansley, known as the "QAnon Shaman," at a Halloween party that he attended.

The government recommends that the Court sentence Johnston to 18 months of incarceration, in the middle of the applicable Guidelines range. An 18-month sentence reflects the gravity of Johnston's conduct, including his spread of disinformation about January 6th and his lack of remorse for participating in the riot.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 161, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The defendant spent a significant amount of his time at the U.S. Capitol inside the Lower West Terrace "tunnel." The government also refers the Court to Exhibit A,[2] which is a compilation video showing the chronology of events inside the Lower West Terrace tunnel on January 6, 2021.

---

[2] The government will provide the Court and the defense with its exhibits via USAfx prior to the sentencing hearing.

**B.      Jay Johnston's Role in the January 6, 2021 Attack on the Capitol**

*Pre-January 6 Text Messages*

On January 3, 2021, the defendant sent an acquaintance a text message stating, "So, might I bump into you at the gala affair this Wednesday? Bring food and a toilet." Exhibit B, text messages from the defendant's cell phone (redacted). The acquaintance responded, "I'm avoiding that like the plague." *Id.* Later in the conversation, the acquaintance asked, "You going there to rally?" Johnston responded, "Yes, going to rally, really, rally." *Id.*

On January 5, 2021, the defendant exchanged text messages with individuals who were planning to travel with him to Washington, D.C. He told them that "the mayor has shutdown every business that hasn't already shut down. Bullshit." Exhibit C, text messages from the defendant's cell phone (redacted).

*January 6 Conduct*

Johnston flew to Washington, D.C. on January 5, 2021, and checked into a hotel near the mall.  That evening, he attended an event near the National Mall where multiple individuals spoke, including Alex Jones. The following morning, Johnston went to the Ellipse and attended the Stop the Steal rally. According to text messages and photographs from his phone, he attended then- President Trump's speech. On January 6, 2021, Johnston wore gray pants, tan shoes, a black leather jacket over a camouflage-patterned pullover. He also at times wore a camouflage-patterned neck gaiter over his face.

4



*Image 2: Still image from open-source video showing Johnston on January 6, 2021*

At approximately 1:33 p.m., Johnston began to march toward the U.S. Capitol. As he

walked, he filmed a video[3] which shows that he passed fencing and "AREA CLOSED" signs as

---

[3] In fact, the defendant filmed at least 34 videos on his cell phone on January 6, 2021.

he approached the building. *See* Exhibit D, video from Johnston's cell phone.



*Image 3: Still image from Exhibit D at timestamp 00:23 showing fencing and "AREA CLOSED" signs on Johnston's route to the Capitol Building.*

Flashbangs could also be heard in the distance as Johnston approached the Capitol Building, and Johnston asked a rioter nearby, "are they setting off mortars or what's going on?" Exhibit D, beginning at timestamp 00:50. Johnston also noticed police officers on the grounds of the U.S. Capitol and narrated for the camera, "Look at the guys on the roof. Just watching." *Id.* at timestamp 1:11. As he got closer to the building, a nearby rioter with a bullhorn called out, "Pence is a traitor!" *Id.* at timestamp 2:30. When he reached the base of the building, Johnston used a metal bike rack which had been turned on its side to scale a stone wall separating the West Lawn from the West Plaza. As he approached the bike rack, he narrated, "Oh I like this." *Id.* at timestamp

4:28.



*Image 4: Still image from Exhibit D at timestamp 4:31 showing the bike rack that Johnston climbed to get to the West Plaza*

After climbing up onto the West Plaza, Johnston filmed the crowd as it used a large

billboard to try to ram the police line. *See* Exhibit E, video from Johnston's cell phone.



*Image 5: Still image from Exhibit E at timestamp 00:30 showing the rioters pushing a billboard toward the police on the West Plaza*

Johnston then zoomed in on police officers deploying oleoresin capsicum ("OC") spray to try to control the crowd. *Id.* at timestamp 00:07. After this, Johnston moved back to the West Lawn and commented, "they're spraying mace, so watch it." *Id.* at 00:27. Johnston told a rioter nearby, "they were macing people because they took a wall down." *Id.* at timestamp 00:50. He also noted, "yeah, the guys have riot shields and all that shit." *Id.* at timestamp 01:14. Shortly after, Johnston

spoke with a nearby rioter about the noises he heard earlier. The rioter told him the noises were flashbangs and Johnston exclaimed, "holy shit! I thought those were celebratory!" *Id.* at timestamp 2:40. Despite all of these signs that his presence was illegal, Johnston stayed on the West Plaza.

By approximately 1:48 p.m., Johnston pushed through the crowd on the West Plaza and up to the police line.



*Image 6: Still image of video from Johnston's cell phone showing the police line on the West Plaza at approximately 1:48 p.m.*

At approximately 2:05 p.m., Johnston filmed rioters on the West Plaza fighting the police by pushing bike racks against them, trying to break their police line. *See* Exhibit F, video from Johnston's cell phone.



*Image 7: Still image from Exhibit F at timestamp 00:22 showing rioters pushing the bike racks and police deploying OC spray*

At approximately 2:30 p.m., rioters overran the police line and barricades on the West Plaza, forcing police to retreat. Johnston, along with many other rioters, surged forward closer to the Capitol building. As Johnston stood on the West Plaza police deployed tear gas and other crowd control measures, causing Johnston to pull his camouflage neck gaiter up over his face. *See*

Exhibit G, open-source video clip.



*Image 8: Still image from Exhibit G at timestamp 00:15 showing Johnston holding his phone up and adjusting his neck gaiter over his face*

By approximately 2:56 p.m., Johnston made his way up to the Inaugural Stage and stood immediately in front of the entrance to the tunnel. Once again, he held his phone up and appeared to be recording. Immediately in front of him, rioters passed a large red construction cone into the

mouth of the tunnel toward the police located inside.



*Image 9: Still image from open-source video showing Johnston recording rioters pushing a large red cone into the tunnel towards police officers*

Johnston, not content with simply watching and recording, then approached the mouth of

the tunnel. When he was under the archway, he turned and waved to other rioters, beckoning them

to join him in fighting the police. *See* Exhibit H, open-source video clip.



*Image 10: Still image from Exhibit H at timestamp 00:13 showing Johnston waving other rioters into the tunnel*

A few seconds later, Johnston performed a series of other hand gestures toward the crowd.



*Image 11: Still image from Exhibit H at timestamp 00:49 showing Johnston making hand gestures to the crowd*

Johnston entered the tunnel at approximately 3:03 p.m. Immediately after he entered, another rioter handed him a bottle of water, which Johnston used to help at least four other rioters wash chemical irritants out of their eyes. *See* Exhibit I, CCTV clip.



*Image 12: Still image from CCTV footage showing Johnston pouring water on another rioter's eyes*

By approximately 3:06 p.m., Johnston had pushed his way through the crowd to about midway into the tunnel. A rioter behind him handed him a stolen United States Capitol Police ("USCP") riot shield. *See* Exhibit J, open-source video, at timestamp 00:25. As Johnston took the shield, another rioter in the tunnel called out "Hey! Everyone with a shield, back up and organize! Make a shield wall!" *Id.* Then other rioters joined in and called out "make a shield wall!" *Id.* Johnston responded to these calls by carrying his stolen USCP riot shield up toward the police line. As rioters continued to call out, "Make a shield wall!", Johnston handed his shield up to the front

row of rioters, directly in front of the police.



*Image 13: Still image from Exhibit J at timestamp 00:44 showing Johnston handing up a stolen USCP riot shield*

After he handed off the stolen riot shield, Johnston remained near the police line as the crowd in the tunnel got denser and rioters called out repeatedly to "push" against the police line. *See* Exhibit K, open-source video. At one point, a rioter right next to Johnston pointed up to the wall and yelled to a second rioter to "block out that camera!" *Id.* at timestamp 00:30. Johnston stayed in the tunnel even when the police sprayed the crowd with OC spray, ducking behind the rioters in front of him for protection. *Id.* at timestamp 00:50.

At approximately 3:10 p.m., Johnston was pushed back toward the tunnel entrance. Despite being pushed all the way to the archway, at 3:11 p.m., Johnston turned and pushed his way back

into the tunnel.



*Image 14: Still image from CCTV footage showing Johnston being pushed out of the archway at 3:11:19 p.m.*



*Image 15: Still image from CCTV footage showing Johnston moving back into the tunnel at 3:11:31 p.m.*

After pushing his way back into the tunnel, at approximately 3:12 p.m., Johnston joined a

group push effort, referred to as a "heave-ho," against the police in the tunnel. During this group push, MPD Officer Daniel Hodges was crushed between the frame of one of the doors in the tunnel and the crowd. *See* Exhibit L, open-source video.



*Image 16: Still image from Exhibit L at timestamp 1:55 showing Officer Hodges pinned in the door*

Johnston was a member of the group of rioters that trapped Officer Hodges, rocking back

and forth, pushing against the police, and yelling out "Heave! Ho!"



*Image 17: Still image from Exhibit M at timestamp 00:03 showing Johnston pushing with other rioters against the police*

As Johnston participated in the "heave ho" push, he appeared to look towards Officer

Hodges.[4]



*Image 18: Still image from Exhibit M at timestamp 1:25 showing Johnston in the group push looking in the direction of Officer Hodges*

Shortly after this heave-ho push, Johnston left the tunnel at approximately 3:13 p.m. However, according to timestamps on videos recovered from his phone, Johnston remained on the Inaugural Stage outside the tunnel until at least 4:50 p.m. During this time, he filmed at least 14 videos of the tunnel and the nearby area, including videos depicting rioters: trying to smash a window next to the tunnel; climbing on top of other rioters to punch, kick and stomp on the police; hacking at police with poles, pipes and metal crutches; pushing a large orange ladder into the

---

[4]  As set out below, Johnston later texted an acquaintance saying that he saw a man getting crushed in the tunnel.

tunnel at police; scaling walls near the tunnel; singing the Star Spangled Banner as they attacked police; spraying police with chemical irritants; and dragging officers out of the tunnel and into the crowd to beat them.

In a video Johnston filmed at 3:54 p.m., a nearby rioter asked Johnston what the rioters in the tunnel were doing. Johnston responded, "if you just go inside about another ten feet, there's uh, a door, double door with the windows broken out of and there's like forty guys stacked on the other side." Exhibit N at timestamp 1:50. The other rioter said, "Why [inaudible]" and Johnston responded, "to get in the building." *Id.*

In another video he filmed of the tunnel at 4:07 p.m., Johnston joked as rioters attacked the police. For example, as rioters pushed an orange ladder at the police in the tunnel, he said, "Okay! We're going to get those light bulbs fixed!" Exhibit P, video from Johnston's phone at timestamp 00:20. "Never bring one gas mask to a fuckin' riot. Cause then you're gonna be the guy at the front!" *Id.* at timestamp 1:55.

In yet another video he filmed at 4:10 p.m., Johnston explained to another rioter, "And they had the line right here[5] and we pushed through that. And they moved to there. They're stuck there, yeah." Exhibit Q, video from Johnston's phone at timestamp 00:35. Later in the same video, he said, "there's just people getting crushed in there." *Id.* at timestamp

The last videos that Johnston filmed at the U.S. Capitol were filmed at 5:07 p.m. and 5:15 p.m. They depict Johnston on the West Plaza as crowd control munitions went off around him and the police finally cleared rioters from the West Front of the U.S. Capitol.

---

[5] The government believes that Johnston was referring to the West Plaza.

***Post-January 6 Messages***

After January 6th, Johnston sent multiple text messages to people claiming that the events at the Capitol were exaggerated by the media or instigated by Antifa and/or the police. For example, on the evening of January 6th, he texted an acquaintance complaining that the media was misrepresenting the event and that the police were the aggressors:



*Image 19: Screenshot of text message sent by Johnston on January 6, 2021 at 9:41 p.m. ET*

Similarly, on January 7, 2021, Johnston sent an acquaintance a message that read, "Here's one of those people who was an 'antifa like' instigator." Exhibit R, text messages from Johnston's phone. Johnston then sent a video of a rioter trying to break one of the windows near the tunnel. *Id.* He sent a text message to another friend that same day claiming the event had been "so twisted

by and spun by the news outlets."



*Image 20: Screenshot of text message sent by Johnston on January 7, 2021*

Johnston messaged yet another acquaintance the same day claiming again that the news was misrepresenting the previous day's events and calling the riot "quite untastic."



*Image 21: Screenshot of text message sent by Johnston on January 7, 2021*

On January 10, 2021, Johnston sent the following message to another acquaintance, calling

the riot a "trap," blaming the police for "heighten[ing] the situation," and claiming he and the other rioters had been "duped."



*Image 22: Excerpt from Exhibit B, text messages from Johnston's phone*

The same day, Johnston made similar claims to another acquaintance claiming, among

other things that, "it wasn't as bad as they say."



*Image 23: Screenshot of a text message sent by Johnston on January 10, 2021*

### Search of Johnston's Residence

On June 1, 2021, the FBI executed a search warrant at Johnston's residence in California. The FBI seized, among other things, Johnston's cell phone, a guest pass dated January 6, 2021 from the hotel Johnston had stayed in, and the camouflage neck gaiter that he wore on January 6, 2021. When agents seized Johnston's cell phone, Johnston claimed the cell phone wasn't his and that he was borrowing it from a friend. When asked to provide the phone number, Johnston refused.

### Johnston's Attendance at a 2022 Halloween Party

On October 27, 2022, a twitter user posted a photograph of Johnston at a Halloween party (Image 1, above). The photograph shows Johnston dressed in costume as January 6th defendant

Jacob Chansley, known as the "QAnon Shaman." Specifically, Johnston had an American flag tied around his neck, red, white and blue face paint on his face, a fur hat with horns on his head, and he was not wearing a shirt. The photograph shows Johnston smiling and laughing.

### Injuries to Officer Hodges

At least one officer was injured from the "heave ho" push that Johnston participated in: MPD Officer Daniel Hodges. As he described in a recent trial, "The strength - - the force of the people trying to attack us and make their way into the Capitol had me pinned against the door frame…. As I'm pinned, my arms are functionally useless. I can't move them. And I'm pinned in such a position that I can't get any functional strength from my legs. So I was very vulnerable at that moment." Exhibit O at 199:5-7; 200:18-21. Officer Hodges described the pain he suffered when he was crushed in the door frame, saying, "It hurt a great deal. It, combined with everything else that was going on, made it difficult to breathe. Being crushed by the shield and the people behind it made me defenseless, injured, made me - - contributed to my diminishing senses after the assault, which is why I was calling for help, because I knew maintaining that position and staying upright was untenable. If I was there much longer being assaulted in such a way, I knew that it was very likely I wouldn't be able to maintain my consciousness and become a liability to the other officers." *Id*. at 204:12-21. Officer Hodges testified that his injuries from that day included "pain and bruising about my entire body, a large contusion on the top of my head … busted mouth, bleeding, lacerations, swollen hand, just generalized pain." *Id.* at 209:6-12. He also testified that he sought medical treatment for these injuries the following morning. *Id.* at 211:2-5.

*Post-Plea Interview*

As of the submission of this memorandum, Johnston has not submitted to an interview with the government pursuant to paragraph 3 of his plea agreement. ECF No. 160, ¶ 3. The government has made multiple attempts to schedule the interview with his counsel, but counsel has failed to provide dates on which the defendant is available.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 13, 2023, a federal grand jury returned a superseding indictment charging Jay James Johnston with five counts, including, obstructing law enforcement officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). ECF No. 71. On July 8, 2024, Johnston was convicted of that offense based on a guilty plea entered pursuant to a plea agreement. ECF Nos. 160, 161.

## IV.    STATUTORY PENALTIES

Johnston now faces sentencing on a single count of obstructing law enforcement officers during a civil disorder.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The government agrees with U.S. Probation's Guidelines calculation as set out in the PSR.

Specifically:

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Bodily Injury | +2 |
| | **Total** | **15** |

*See* PSR at ¶¶ 56-63.

The government anticipates that Johnston will contest the two-level enhancement pursuant to U.S.S.G. § 2A2.4(b)(2) for bodily injury to Officer Hodges. As this Court found in sentencing Johnston's co-defendant, Kyle Kumer, the application of the enhancement is proper because Johnston clearly participated in the "heave ho" push that resulted in Officer Hodges' injuries and it was at least reasonably foreseeable to Johnston that an officer would be crushed by the mob's efforts. Just like Kumer, Johnston had been inside the tunnel for some time before participating in this "heave ho" push. Johnston knew that there were police officers in the tunnel and that the purpose of the group push was to push against those officers. Therefore, the two-level enhancement should apply in this case, just as the Court found that it applied in defendant Kumer's case.

The plea agreement in this case also sets out a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 if the defendant, "clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through [the defendant's] allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and

imposition of sentence." ECF No. 160, ¶6A. As set out in the government's response to the defendant's recent motion to compel (ECF No. 181, pg.4, n.2), the government views the defendant's assertions in his motion to compel that he only pled guilty "because the alternative – that is, to go to trial on the merits – proved to be the riskier option all factors considered" (ECF No. 180 at 10) and that he is only guilty "by association" with his co-defendants (*id.*) to suggest the defendant is now denying his guilt. Should Johnston maintain this position at sentencing, the government will argue that he should not be awarded any credit for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* U.S.S.G. § 3E1.1(a) ("If the defendant *clearly* demonstrates acceptance of responsibility for his offense…." (emphasis added)); *see also id.* App. Note 1 ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *id.* App. Note 3 (while entry of a guilty plea is "significant evidence of acceptance of responsibility ... this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility").

The U.S. Probation Office calculated the defendant's criminal history as category II.[6] PSR ¶ 74. Accordingly, based on the government's calculation of Johnston's total adjusted offense level, assuming he receives a decrease for acceptance of responsibility, at 13, Johnston's Guidelines imprisonment range is 15 to 21 months' imprisonment. If Johnston continues to deny

---

[6] This calculation is higher by one point than the calculation set out in the plea agreement. *See* ECF No. 160, ¶ 6B. However, Johnston acknowledged in the plea agreement that "after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease." *Id.*

his guilt, his total adjusted offense level will be 15, which when combined with a criminal history

category II, results in a Guidelines imprisonment range of 21 to 27 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown above, Johnston's felonious conduct on January 6, 2021 was part of a massive

riot that almost succeeded in preventing the certification vote from being carried out, frustrating

the peaceful transition of Presidential power, and throwing the United States into a Constitutional

crisis. Johnston's text messages before January 6 indicate he was aware that the rally could turn

into a riot even before he traveled to Washington, D.C. Then, once he marched to the U.S. Capitol,

he positioned himself in the most violent areas of the riot—the West Plaza and the tunnel—for a

total of almost four hours. He witnessed and filmed numerous horrific acts of violence by rioters

against the police during that time, often while cracking jokes. Johnston himself joined in the

violence when he entered the tunnel for ten minutes to help other rioters push against the police –

resulting in injury to Officer Hodges – and to build a "shield wall" against police. Yet, despite

everything he saw and did on January 6th, he told others that the attack was exaggerated by the

media and that it was a trap. He also tried to thwart law enforcements attempts to seize his cell

phone pursuant to a search warrant by claiming the phone didn't belong to him. Finally, and

perhaps most egregiously, he made a joke out of his participation in the riot by dressing up as a

rioter for Halloween. The nature and circumstances of Johnston's offense were of the utmost

seriousness, despite his obvious belief to the contrary, and fully support the government's recommended sentence of 18 months' incarceration, at the middle of the Guidelines range.

**B. The History and Characteristics of the Defendant[7]**

Johnston is a 56-year-old actor who lives near Los Angeles, California. Johnston grew up in a good home, free of abuse or neglect. PSR at ¶ 84. He graduated from high school and college. PSR at ¶¶ 102-103. He is in good physical and mental health and has one child with a neurodivergent condition. PSR at ¶¶ 95, 97, 87. Johnston enjoyed a successful career as a comedic actor, writer and producer for many years in the television and film industry. PSR at ¶ 108. While Johnston's background may be considered mitigating in most cases, here, Johnston's background shows that he had many other choices and opportunities than to commit the instant offense on January 6, 2021. Johnston's crime was not motivated by addiction or poverty. Instead, Johnston chose to participate in the riot at the United States Capitol because his preferred candidate lost an election.

Johnston has three previous criminal convictions:

- In 2007, he was convicted of driving without a license and sentenced to 13 days' confinement and 12 months of probation. PSR at ¶ 69.

- In January 2018, he was charged with driving while suspended. PSR at ¶ 70. A bench warrant was issued for him when he failed to appear on that charge and the warrant was later recalled. *Id.* He pled guilty in October 2019 and was sentenced to 24 months'

---

[7] The PSR notes that U.S. Probation was not able to verify certain of the information provided by Johnston during his pre-sentence interview because Johnston did not provide U.S. Probation with signed authorizations to obtain verifications. PSR at ¶ 79, note 4.

probation. *Id.* In October 2020, a bench warrant was issued for the revocation of his probation. *Id.* His probation was not terminated until September 2023. *Id.*

- In March 2018, he was charged with receiving known stolen property. PSR at ¶ 71. He was convicted in March 2019 and sentenced to 1 day in jail and three years' probation. *Id.*

While none of Johnston's prior convictions are for violent conduct, at least two of them demonstrate a disinclination to follow court orders. Two different warrants were issued for Johnston as part of his 2018 charge for driving with a suspended license – a warrant for failing to appear and another warrant for revocation of his probation. It also appears that Johnston was on probation for both of his most recent convictions on January 6, 2021 when he committed the instant offense. Thus, his criminal history suggests a need for a sentence that affords greater specific deterrence and promotes respect for the law. A Guidelines sentence of 18 months will serve these goals.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Johnston's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

In this case, it's evident that Johnston has little respect for the law and little understanding of the seriousness of the offense he's committed. Johnston's 2022 Halloween costume—worn *after* the FBI executed a search warrant on his house when Johnston knew he was a target of a serious federal criminal investigation—shows just how little respect he has for the law. He thinks his participation in one of the most serious crimes against our democracy is a joke. A Guidelines sentence of 18 months, therefore, will serve the additional purpose of promoting respect for the law in this case.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Johnston in particular also weighs heavily in favor of a term of incarceration. Neither Johnston's family obligations, nor the potential consequences on his career were enough to stop him from participating in the riot at the United States Capitol. Similarly, the violence he witnessed early on against the police wasn't enough to make him turn around and leave; instead, he stayed at the Capitol until the bitter end.

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Johnston's lack of remorse also suggests he is in greater need of specific deterrence. Specifically, Johnston's intentional spreading of misinformation to family and friends about the riot after January 6 shows either his unwillingness to accept the truth of what he saw that day or his firm commitment to a narrative that he and other rioters were victims. Either way, this behavior points to a higher risk of recidivism. Johnston's apparent willingness to joke and make light of his participation in the riot is also troubling and suggests he doesn't have any remorse for his actions on January 6.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

34

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, three of Johnston's co-defendants have already been sentenced in this case. For ease of reference, below is a brief summary of the cases of each of Johnston's three co-defendants, including a comparison of the sentencing factors present in their cases with the factors present here.

*Kyle Kumer*. Kumer brought his elderly mother with him to the riot at the U.S. Capitol on January 6. Kumer and his mother, like Johnston, arrived on the West Plaza in time to see rioters

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

fighting the police. Kumer then went up to the tunnel. He and his mother entered the tunnel and remained there for 25 minutes. Kumer, like Johnston, participated in the heave-ho push that injured Officer Hodges. Kumer, like Johnston, also made statements to friends and family claiming the event was exaggerated or was a setup. However, Kumer never obtained, possessed or used stolen police equipment on January 6. Kumer also had a lower Guidelines range than Johnston—a range of 12 to 18 months—because he had no criminal history. As here, the government requested a sentence in the middle of the Guidelines range. This Court sentenced Kumer to 10 months' incarceration. This Court should sentence Johnston to 18 months to account for Johnston's higher criminal history, his commission of his offense while on probation for previous criminal convictions, and Johnston's more egregious post-January 6 conduct.

*Alan St. Onge.* St. Onge was convicted of two counts of obstructing law enforcement during a civil disorder for conduct on the East Front of the U.S. Capitol and in the tunnel. However, unlike Johnston, St. Onge was at or near the tunnel for only about 25 minutes. St. Onge entered and exited the tunnel three times, and like Johnston, participated in one heave-ho push. St. Onge, like Johnston, was given a stolen police riot shield while in the tunnel, but St. Onge set it down and didn't use it against the police as Johnston did. St. Onge had a more egregious criminal history than Johnston, with 13 prior convictions, and new charges since January 6, 2021. Like Johnston, St. Onge was also under a criminal justice sentence on January 6, 2021. However, there was no evidence that St. Onge spread disinformation about January 6th after the riot or made light of his participation in the riot in public. St. Onge had the same Guidelines range as Johnston: 15 to 21

months. This Court sentenced him to 18 months' incarceration. The Court should give Johnston the same sentence.

*William "Jessie" Stover.* Stover, like Johnston, spent multiple hours in the area in and around the tunnel. But unlike Johnston, Stover entered the tunnel three different times and participated in at least two heave-ho pushes. On the other hand, Stover never obtained or used any police equipment while in the tunnel. Similar to Johnston, Stover had two prior convictions that resulted in a criminal history score of II, but Stover also had significant mitigating factors. Specifically, Stover has a child who is severely disabled. He also suffered and witnessed extreme forms of abuse and neglect in his childhood. There was also no evidence that Stover spread disinformation or conspiracy theories about the events of January 6 or otherwise made light of the riot like Johnston did. Stover's Guidelines range was lower than Johnston's—10 to 16 months—and this Court sentenced him to a below-Guidelines sentence of 6 months' incarceration. The Court should sentence Johnston to 18 months because Johnston's conduct in the tunnel—using a stolen police riot shield and injuring Officer Hodges—was arguably more egregious than Stover's conduct, Johnston is lacking the same mitigating circumstances as Stover, and Johnston's post-January 6 conduct indicates Johnston is at a higher risk of recidivism.

In addition to Johnston's co-defendants, the government also submits the following comparators from other defendants sentenced by this Court who committed crimes in the Lower West Terrace tunnel:

*United States v. Giberson*, 23-CR-115 (CJN). Giberson entered the tunnel close in time to Johnston – at approximately 3:08 p.m. Like Johnston, he helped other rioters in the tunnel to make

a "shield wall" against the police. He also pushed against the police and encouraged other rioters to enter the tunnel and fight. He was pushed out of the tunnel by police after ten minutes but, like Johnston, stayed near the tunnel for much longer watching rioters attack police. Giberson pleaded guilty to a single violation of 18 U.S.C. § 231(a)(3) and his guidelines range was 8-14 months. This Court sentenced Giberson to 2 months' incarceration. Giberson's case is not an apt comparator to Johnston's because Giberson was 19 years old on January 6th (compared with Johnston's 53 years), and as such, one of the youngest January 6 defendants. Giberson had just graduated college prior to his sentencing hearing, had no criminal history, did not make light of his participation in the riot afterward, and expressed remorse for his actions on January 6th.

*United States v. Doolin*, 21-CR-447 (CJN). Doolin, like Johnston, was also present on the West Plaza when the riot erupted on January 6th. He witnessed violence against the police in that area before moving up to the Lower West Terrace tunnel. Like Johnston, he filmed the events at the tunnel on his phone for a long period of time. He also found a discarded or stolen police riot shield that he used against the police. However, Doolin was in the tunnel for a shorter amount of time than Johnston and did not injure any officers. Doolin made false statements to the FBI following his arrest and otherwise indicated a lack of remorse for his actions, similar to Johnston. Doolin was convicted following a bench trial of violations of 18 U.S.C. §§ 231(a)(3), 641 and misdemeanors. The Court determined his applicable Guidelines range was 12 to 18 months and this Court ultimately sentenced him to a middle of the Guidelines sentence of 15 months. The Court should do the same here and sentence Johnston to a middle of the Guidelines sentence of 18 months. Johnston and Doolin both used stolen police equipment against the police at the tunnel,

they both observed and filmed assaults on the police for extended periods of time in the tunnel, and their post-January 6 conduct indicated a lack of remorse.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Johnston must pay $2,000 in restitution, which reflects in part the role Johnston played in the riot on January 6.[12]  Plea Agreement at ¶ 13. As the plea agreement

---

[11]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[12]  Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Johnston's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 148.

## VIII.   FINE

The defendant's convictions for violation of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months' incarceration, three years of supervised release, $2,000 in restitution and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    /s/ *Kaitlin Klamann*
       KAITLIN KLAMANN
       SEAN MCCAULEY
       Assistant United States Attorneys