UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 1:23-cr-00237-CJN |
| JAY JAMES JOHNSTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT JAY JAMES JOHNSTON'S SENTENCING MEMORANDUM**

   The historical impact of the events that took place at the United States Capitol on January 6, 2021, cannot be understated.  Yet no one person is responsible for the attack on the Capitol. Since his indictment in July 2023, the government has persistently overstated Mr. Johnston's participation at the Capitol that day: because he is an acclaimed Hollywood actor, and the government is using his status to make a point to the public.  At the same time, the government has steadfastly refused to admit that the evidence in support of Mr. Johnston's indictment does not support the oversized and disproportionate role it accuses Mr. Johnston of playing.  At its core, the government has continued to advance Mr. Johnston's indictment on a "guilty-by-association" basis, in which it compounds the conduct of others in the proximity of Mr. Johnston with his alleged conduct, rather than maintaining focus on Mr. Johnston's individualized actions.

   To the contrary, Mr. Johnston's conduct in this action following the events of January 6, 2021, reflect genuine remorse and an acceptance of responsibility.  It was Mr. Johnston, through counsel, who contacted the government to volunteer his identity as a person depicted at the Capitol on January 6. Mr. Johnston, through counsel, thereafter voluntarily produced all media evidence in his possession depicting the events of January 6.  Nevertheless, and in spite his cooperation and representation by counsel, the government chose to execute a search warrant on his home involving

1

numerous FBI agents. Despite the government's aggressive posture, Mr. Johnston continued to cooperate, providing information necessary for a privilege review of the materials seized from his home. And then, years after his self-identification and offer of cooperation, the government rewarded Mr. Johnston's reasonableness by indicting him.

While Mr. Johnston has pleaded guilty to civil disorder in violation of 18 U.S.C. § 231(a)(3), he should be sentenced only for his actual conduct on January 6; independent of what may have occurred around him and irrespective of his status as a Hollywood actor. To that end, the government submits that the guidelines range for Mr. Johnston should include an enhancement because of alleged physical contact pursuant to § 2A2.4(b)(1) of the U.S. Sentencing Guidelines as well as an enhancement for bodily injury under pursuant to § 2A2.4(b)(2) of the U.S. Sentencing Guidelines. In sum, the government recommends a sentence of eighteen months' imprisonment. Gov't Mem. at 3 (Oct. 21, 2024) (ECF No. 191). Accordingly, and respectfully, Mr. Johnston submits that that the government's recommended sentence of eighteen months' imprisonment would vitiate the Court's statutory obligation to, "impose a sentence sufficient, but not greater than necessary, to comply with" federal sentencing goals and guidelines. 18 U.S.C. § 3553(a).

I.   **FACTUAL BACKGROUND**

Rather than recount the tragic events of January 6, the Court should consider only Mr. Johnston's specific conduct that day. Mr. Johnston traveled to Washington, D.C. from his home in Los Angeles, California on January 5, 2021, to attend what he understood to be an opportunity to exercise his First Amendment rights at a pro-Trump rally. Upon his arrival that evening, Mr. Johnston attended events on the National Mall that same evening where he listened to various speakers. Endeavoring to experience more of the same the next morning, Mr. Johnston made his way to former President Donald Trump's speech at the Ellipse. Mr. Johnston did not don

2

paramilitary gear or have weapons on his person as other participants of that day did – he wore an otherwise ordinary and unassuming outfit of gray pants, tan shoes, a camouflage-patterned shirt, a camouflaged-pattered neck gaiter (a routine accessory as a face-mask-like face covering during the COVID-19 pandemic), with a black leather jacket.

As history would have it, the notorious and unfortunate events at the Capitol ensued. Amid the chaos, Mr. Johnston soon found himself by the Tunnel leading into the Capitol Building on the Lower West Terrace, where he was one among many other individuals. A plethora of varied conduct occurred by the Tunnel, both among civilians and law enforcement officers alike. Some of this conduct was, indeed, criminal, while other conduct could clearly be distinguished therefrom. Others around Mr. Johnston at the Tunnel engaged throwing and striking objects at the police, spraying officers with chemical irritants, and forcefully pushing up against the officers defending the Tunnel. While it can be acknowledged that conduct did occur, it is concurrently clear that Mr. Johnston was not an active participant of the same. Mr. Johnston's conduct was patently not criminal, and he submits that the charge to which he has pleaded guilty was brought by his mere presence amid the chaos by the Tunnel.

## II.    APPLICATION OF 18 U.S.C. § 3553(A) FACTORS

18 U.S.C. § 3553(a) requires the Court to, "impose a sentence sufficient, but not greater than necessary to comply with" federal sentencing goals and guidelines. In doing so, the court examines, "the nature and circumstances of the offense and the history and characteristics of the defendant. . . the need for the sentence imposed. . . the kinds of sentences available. . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . and the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a). In an effort to aid the Court, Mr. Johnston addresses each factor in the subjections below.

A. <u>The Nature and the Circumstances of the Offense</u>

A sum total of the events that culminated at the Tunnel saw a long and arduous scrimmage between civilians and law enforcement officers alike. In the Tunnel, many individuals engaged in violence and aggression toward law enforcement officers protecting the region, however Mr. Johnston was not one of them. The government describes Mr. Johnston's participation in the Tunnel has having engaged in a "heave-ho" pushing skirmish between rioters and law enforcement, however it is clear that the "heave-ho" occurred around Mr. Johnston, not that he participated in, let alone caused the same. While it is true that Mr. Johnston was "in" the "heave-ho" event, he cannot be burdened by or be wholly responsible for the collective actions of everyone around him that lead to his involvement, nor can the intended consequences of others intentionally engaging in the pushing be transferred to Mr. Johnston – put differently, Mr. Johnston was charged by association. That the government alleges that Mr. Johnston participated in a "group push effort," without specifically alleging any individualized effort by Mr. Johnston actions is precisely analogous to the "violence-by-presence" theory rejected by the district court in *United States v. Tyng Jing Yang*. 2024 U.S. Dist. LEXIS 22938 at *11-12 (D.D.C. Feb. 9, 2024) ("The Court thus rejects the government's violence-by-presence theory of [U.S.S.G.] § 4C1.1(a)(3). In so doing, it joins the view of at least six other judges in this District.").

Moreover, a careful reading of the government's account of Mr. Johnston's participation in its sentencing memorandum reveals the way in which it uses the conduct of *others* to criminalize the conduct of Mr. Johnston. The government advances the idea that Mr. Johnston was an active member of the "shield wall" used to aid in the pushing between the rioters and law enforcement – yet acknowledges that a rioter – who was not Mr. Johnston – suggest that the individuals "with a riot shield organize a shield wall." *See* Gov't Mem. at 14 (Oct. 21, 2024) (ECF No. 191) ("Hey! Everyone with a shield, back up and organize! Make a shield wall!"). At best, and by the

4

government's account, "[a] rioter behind him handed him a . . . United States Capitol Police ("USCP") riot shield" and "handed off the stolen riot shield." *Id.* at 14-15. Of further note, the government avers that, "a rioter right next to Mr. Johnston" – to be distinguished from Mr. Johnston himself – "pointed up to the wall and yelled to a second rioter" – again, not Mr. Johnston – to "'block out that camera!'" *Id.* at 15. Indeed, the government even notes that Mr. Johnston filmed the criminal conduct of others on that day – in other words, Mr. Johnston was an observer. *Id.* at 19 ("Johnston remained outside the Tunnel. . . he filmed at least 14 videos of the Tunnel and the nearby area, including videos depicting rioters: trying to smash a window next to the tunnel; climbing on top of other rioters to punch, kick and stomp on the police; hacking at police with poles, pipes, and metal crutches. . ." among other things). Absent the government's surplusage regarding other proximate rioters' conduct, Mr. Johnston's independent conduct, taken alone, could hardly be viewed as unlawful. Equally as plausible, Mr. Johnston's interaction with the riot shield was an effort to return the same to the police standing immediately before him.

B. History and Character of the Defendant

Mr. Johnston was born and raised in a suburb of Chicago, Illinois. Presentence Investigation Report at ¶ 80 (Oct. 21, 2024) (ECF No. 189) ("PSR"). Although his parents divorced when he was two years old and he split time between both sets of parents, Mr. Johnston lived a relatively normal and "good" childhood, maintaining close relationships with his parents, stepparents, and siblings. PSR at ¶ 82-84. Shortly after obtaining a Bachelor of Arts degree from Columbia College in Chicago, Mr. Johnston relocated from Illinois to Los Angeles, California in 1993 to pursue acting as a career. PSR ¶ at 84, 103. Dedicated to his craft, Mr. Johnston found great success in Hollywood as an actor, writer, and producer including accolades for his role as the voice actor for Jimmy Pesto, Sr. in the animated series Bob's Burgers and as Officer Taylor in

Arrested Development.[1]  PSR at ¶ 108-11.  Regrettably, Mr. Johnston has not been able to sustain his livelihood as an actor after his involvement at the Capitol on January 6, 2021, and was subsequently publicly dropped from various projects and has effectively been blacklisted by the film and television industry.[2]  Chagrined by the scorn he has faced in Hollywood and despite his established successful career as an actor, Mr. Johnston has essentially been blacklisted by Hollywood, and has since not been able to find work in acting.  Instead, Mr. Johnston has worked as a handyman for the last two years – an obvious far cry from his actual expertise and livelihood in film and television.

Of utmost importance to him, Mr. Johnston plays an integral role in the life and care of his 13-year-old autistic daughter.  PSR ¶ 87.  Although Mr. Johnston and his daughter's mother share physical custody of their daughter, Mr. Johnston is the most stable caregiver in her life and provides the structure and routine his daughter needs to thrive and be successful, including scheduling and taking her to various occupational and speech therapy and psychologist appointments.  PSR at ¶ 87-88.  In addition to being a responsible and active parent to his teenaged daughter, Mr. Johnston also assumes the role of homeschooling her.  PSR at ¶ 88.  Mr. Johnston's brother, Tim, has affirmed the integral role Mr. Johnston plays in his daughter's life, explaining that his daughter, "needs a lot of supervision, and that routine is extremely important[,]" and emphasized that any interruption to the routine that Mr. Johnston keeps her on "really sets her back."  Accordingly, any incarceration of Mr. Johnston would not only impact his life in its individual capacity but would disparage the life of his daughter with special needs.

---

[1] *Jay Johnston*, https://www.imdb.com/name/nm0426678/ (last visited Oct. 24, 2024).
[2] Bill Chappell, *Actor Jay Johnston of "Bob's Burgers" and Other Comedies Pleads Guilty in Jan. 6 Case* (July 9, 2024 1:13 PM EDT), available at https://www.npr.org/2024/07/09/nx-s1-5033776/jay-johnston-guilty-jan-6-bobs-burgers-arrested-development.

In addition, numerous members of Mr. Johnston's family, friends, and members of his community have written letters of unwavering support of Mr. Johnston, validating not only his crucial role in his daughter's life and rearing, but also affirming all of Mr. Johnston's positive qualities, the integral role he plays in his community, and dedication to his work, irrespective of whether it is acting, roofing, carpentry, or home repairs.  These letters are appended to this memorandum as Exhibits A through G and will be filed under seal.

C.  The Need for the Sentence Imposed

When contemplating the need for the sentence imposed, the Court shall consider

> reflect[s] the seriousness of the offense, promot[ing] respect for the law, and provid[ing] just punishment for the offense. . . afford[s] adequate deterrence to criminal conduct. . . protect[s] the public from further crimes of the defendant. . . and provide[s] the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

   i.   *Seriousness of the Offense*

Mr. Johnston acknowledges the severity of the lasting impact of the events that occurred at the Capitol on January 6.  However, Mr. Johnston reiterates that the overall impact of the events of that day should not overshadow the reality of his actual conduct.

   ii.   *Adequate Deterrence to Criminal Conduct and Protection from Future Crimes*

Although Chapter Four of the U.S. Sentencing Guidelines provide guidelines to calculate the criminal history category of a defendant, it cites that the need for such considerations is contemplated by the § 3553(a)(2) factors because, "past criminal conduct is directly relevant to those purposes."  18 U.S.C., Ch. Four, Pt. A.  Despite the goal of § 3553(a)(2) to deter criminal conduct and to protect against future criminal conduct of the defendant, the statutory text does not *require* a defendant's criminal history to be contemplated at sentencing.

7

In Mr. Johnston's case, the government cites the alleged criminal convictions of Mr. Johnston, which it uses to support a criminal history score of two, placing him in the criminal history category of II.  *See* PSR ¶¶ 69-74.  First, the government has wholly failed to cite, let alone provide, records sufficient to confirm the veracity of this criminal history.  These convictions are significantly distinct from the conduct for which Mr. Johnston is pleading guilty, and thus considerations of his criminal history record in the instant matter conflates the objective of deterrence.  For each of the alleged prior convictions, the PSR states its source as having been located in the National Crime Center Information Center, the Pretrial Services Agency for the District of Columbia, and Los Angeles County Superior Court records, but has not produced the records themselves.   PSR ¶¶ 69-74.  Although Mr. Johnston objects to criminal history considerations with respect to his sentencing, he would find such considerations "less objectionable" had provided the actual or certified records of the criminal convictions it cites in support of his criminal history category of II.  *See United States v. Carter*, 591 F.3d 656, 659 (2010) (holding that, "certified state court records are sufficiently reliable to support a finding of a prior conviction at sentencing.").  *See also In re Sealed Case*, 552 F.3d 841, 846 (D.C. Cir. 2009) (holding that where the government seeks a sentence enhancement, it must "prove a prior conviction by a preponderance of the evidence.").

      *iii.*    *Need for Treatment and Training*

Mr. Johnston has never suffered from, or been treated for, any mental or emotional health problems.  PSR ¶ at 97.  Nor has there been any suggestion of a need for treatment and/or training.  *See* PSR at ¶ 98.

   D. <u>Available Sentences</u>

A conviction under 18 U.S.C. § 231(a)(3) carries a maximum sentence of five years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18

U.S.C. § 3571(b)(3); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. According to the PSR, a guidelines range of 18-21 months' incarceration, one to three years' supervised release, a fine between $5,500-$55,000, $2,000 restitution, and a special assessment of $100 is recommended. For its part, the government recommends a sentence of 18 months' incarceration, three years of supervised release, and $2,000 in restitution and a $100 special assessment. Gov't Mem. at 41 (Oct. 21, 2024) (ECF No. 191). Mr. Johnston suggests a lesser sentence is warranted, for the reasons that follow.

E.  The Need to Avoid Unwarranted Sentencing Disparities

The government argues that the two-level enhancement pursuant to U.S.S.G. § 2A2.4(b)(2) applies based on bodily injury to Officer Hodges. The enhancement was applied when sentencing Mr. Johnston's co-defendant, Kyle Kumer, when he entered the Tunnel and participated in a "heave ho" push. Gov't Mem. at 27 (Oct. 21, 2024) (ECF No. 191). This Court sentenced Mr. Kumer to 10 months' incarceration and the government argues that this court should sentence Mr. Johnston to 18 months' incarceration based on Mr. Johnston's higher criminal history and difference in conduct that occurred January 6. *Id.* at 36. Mr. Johnston's conduct, however, is nowhere near the severity of Mr. Kumer's. The government submits, "Johnston entered the Tunnel at approximately 3:03 p.m. Immediately after he entered, another rioter handed him a bottle of water, which Johnston used to help at least four other rioters wash chemical irritants out of their eyes." *Id.* at 15. Mr. Johnston demonstrated empathy towards others who were hurt and attempted to help them. He repeated these actions for four different people.

The government also references Mr. Johnston's other co-defendants and argues that Mr. Johnston's conduct is either similar or more egregious than that of his co-defendants. However, Mr. Johnston has several distinctions that separate him from Alan St. Onge and William "Jessie"

9

Stover. In Alan St. Onge's case, he had entered and re-entered the Tunnel on three occasions, participated in one heave-ho push, obtained and used a police shield in the Tunnel, and has 13 prior convictions. The government emphasizes that the only main distinction between Mr. Johnston and Mr. St. Onge is that Mr. St. Onge did "not make light of his participation in the riot in public" yet both defendants have the same Guidelines range. *Id.* at 36. The government also emphasizes that Mr. St. Onge spent 25 minutes inside the Tunnel while Mr. Johnston remained in the Tunnel and on the Inauguration Stage for much longer. The reality, however, is that while Mr. Johnston was inside the Tunnel, he sought to help others while Mr. St. Onge engaged in repeated attempts to re-enter the fray of the Tunnel. Mr. Johnston should not receive the same sentence as Mr. St. Onge based on Mr. St. Onge's more egregious criminal history with 13 prior convictions, including some violent convictions. Not only has the government provided insufficient evidence to permit the Court to rely on his prior purported convictions, they were not violent.

In the case of William Stover, a Guidelines range that is lower than Mr. Johnston's was applied, and the government argues that this is because Mr. Stover has significant mitigating factors: his child, the lack of evidence in spreading conspiracy theories about the events of January 6, and his lack of use of a police riot shield. *Id.* at 37. However, Mr. Stover's conduct is much more egregious than that of Mr. Johnston's, as evidenced by Mr. Stover's deliberate participation in at least two heave-ho pushes. The government contends that, "Johnston knew that there were police officers in the Tunnel and the purpose of the group push was to push against those officers" *Id.* at 27. This statement can easily be applied to Mr. Stover and his decision to engage in multiple heave-ho pushes in a crowded area making up of police officers and dozens of others. Similarly, Mr. Johnston has a daughter with special needs and for whom Mr. Johnston is the primary

caregiver, and thus warrants the same, if not more, of the Court's consideration that it gave to Mr. Stover.

The government further compares Mr. Johnston to several other cases that this Court has presided over. In the case of *United States v. Giberson*, 23-CR-115 (CJN), defendant Giberson allegedly took actions comparable to Mr. Johnston, including that Mr. Giberson participated in building a "shield wall" against the police and watched others do so while in the Tunnel. Mr. Giberson received a sentence of two months' incarceration, and the government emphasizes that the two defendants are different based on age, life accomplishments, criminal history, and remorse. Gov't Mem. at 38. Contrary to the government's assertions, Mr. Johnston did not assist in the creation of a shield wall. He passed a police riot shield to the police line and has expressed remorse for his actions on January 6, as evidenced by his acceptance of his guilt in his text messages sent in the days after January 6 and how his participation has affected his life and employment.

The government also cites *United States v. Doolin*, 21-CR-447(CJN) and compares Mr. Johnston's conduct to that of Mr. Doolin since they both filmed the events in the Tunnel and used police riot shields while in the Tunnel. Gov't Mem. at 38. The government asserts that Mr. Doolin received a shorter Guidelines range since Mr. Doolin did not injure a police officer. *Id*. But Mr. Johnston also did not injure a police officer. Rather, a police officer near Mr. Johnston was injured. The two are not the same. While Mr. Doolin received a short Guidelines range, his overall conduct is egregious since he made false statements to the Federal Bureau of Investigation ("FBI") and demonstrated a lack of remorse. *Id*. This can be distinguished from Mr. Johnston's conduct, who, as soon as he was identified as a participant in the Capitol Riots in 2021, immediately contacted counsel in an effort to cooperate with the government's investigation (notably, however, the government did not formally indict Mr. Johnston until two years later, in July 2023). It also

11

warrants renewed consideration to highlight Mr. Johnston's demonstrated willingness and need to help others who were hurt inside the Tunnel that day, in addition to his feelings of extreme dissatisfaction for the events that occurred on January 6, particularly how so many people were hurt.

This Court has also presided over several other cases involving 18 U.S.C. § 231(a)(3). In the case of *United States v. Shawn Price*, 22-cr-106 (CJN), Mr. Price was sentenced to 12 months' and one day incarceration, a shorter sentence than what is proposed for Mr. Johnston. While present at the Capitol building on January 6, 2021, Mr. Price made a series of exclamations that utilized profane language and established his animosity towards police officers. Gov't Mem. at 8 *United States v. Shawn Price*, 22-cr-106 (CJN) (D.D.C. Feb. 3, 2023) (ECF No. 42). Afterwards, Mr. Price sent various Facebook messages that bragged about his actions on January 6th. He notably says "We did it bro we took it the fuck ober . . . Over . . . We are inside the capitol now" and "me and 4 of my chapter brothers pushed that line and started it ourselves had to be done." *Id*. at 11. Mr. Johnston's statements while at the Capitol building do not include the same level of profanity and intent to overrun police officers that Mr. Price's statements included. Mr. Johnston's text messages also do brag about his actions in the way that Price's messages do, but rather include acknowledgement of his wrongdoing and general disdain to the harm suffered by so many.

On a separate, but related note, Mr. Johnston has been thoroughly punished as a result of his involvement in the events at the Capitol on January 6. As earlier noted, he has been excommunicated by Hollywood film and television opportunities, and while a distinguished professional actor, now can only find work as a handyman. Mr. Johnston has been shunned by many other people in his community, including colleagues and friends. Moreover, a significant sentence of incarceration would remove him from a developmental time in his special needs

12

daughter's life, who relies on Mr. Johnston has her primary, stable parental force in her life, punishing her even though she did not commit any crimes.

### III.     STATUTORY AND GUIDELINES ANALYSIS

18 U.S.C. § 3553(b) bestows upon the Court the ability to adjust the sentencing range calculated by the statute to ensure that an appropriate sentence is reached and requires the Court to consider factors that would ensure a sentence which accurately reflects a convicted individual's actual level of culpability. *See* 18 U.S.C. § 3553(b) ("[T]he court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."). Concurrently, and although the Court must give, "respectful consideration to the [Sentencing] Guidelines," (*Kimbrough v. United States*, 552 U.S. 85, 96 (2007) it is not required to be beholden to them because the U.S.S.G. are "advisory" – they are *guidelines*. *See United States v. Booker*, 543 U.S. 220, 245 (2005) (finding that the guidelines are "effectively advisory.").

The government, relying on the U.S. Probation Office's analysis, proposed a calculation under the U.S.S.G. of 15 points: ten points allocated to the base level offense (U.S.S.G. § 2A2.4); three points allocated for physical contact (U.S.S.G. § 2A2.4(b)(1); and two points allocated for bodily injury (U.S.S.G. § 2A2.4(b)(2). PSR at ¶¶ 56-63. The government further argues that a two-point reduction for acceptance of responsibility under § 3E3.1.1 is not appliable to Mr. Johnston. Gov't Mem. at 28 (Oct. 21, 2024) (ECF No. 28). For the following reasons, the guidelines calculations should be less than the government's proposal. The government contends that the appropriate sentence for Mr. Johnston is 18 months' incarceration, three years of supervised release, $2,000, and a $100 special assessment. *Id.* at 41. This recommendation of the

government, however, relies on misapplied enhancements under §§ 2A2.4(b)(2) and 4C1.1(a)(3) of the Sentencing Guidelines.

    A.  <u>U.S.S.G. § 3E1.1 Should Apply</u>

Pursuant to the plea agreement in this case, Mr. Johnston may receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 if Mr. Johnston "clearly demonstrates acceptance of responsibility, to the satisfaction of the Government . . ." Plea Agreement at 2-3 (July 8, 2024) (ECF No. 160). Mr. Johnston demonstrates that this reduction applies to him, as he not only has pleaded guilty but is extremely aware of the role that he has played in the events occurring on January 6, 2021. His awareness can be seen in the days immediately following January 6 through several text messages expressing his remorse. On January 6, 2021, Johnston sent an acquaintance a message that states, "I'm in Washington DC and I was at the capital today protesting and it got crazy. I got maced and tear gassed with a whole bunch of other people. *I don't agree with the violence*." (Emphasis added) Gov't Sentencing Mem. at 21, Image 19 (Oct. 21, 2024) (ECF No. 191). Mr. Johnston sent another message to an acquaintance on January 7, 2021, and said "I am still in dc and my experience yesterday has left me disappointed and disillusioned and sore . . . I got maced and tear gassed multiple times and saw many people get hurt." *Id.* at 22, Image 20. Furthermore, Mr. Johnston sent a text message on January 10, 2021, that states, "[a]lthough it wasn't directly my fault, I did take part in the hysteria that erupted and was maced and tear gassed accordingly." *Id.* at 23, Image 22. The two-level reduction should be applied to Mr. Johnston based on his acceptance of guilt, as evidenced by his remorse shown through text messages and the overall impact on his family life and employment.

Moreover, Mr. Johnston has been cooperative since the events of January 6. Put simply, he's done everything right. He voluntarily self-identified himself. He turned over all the media captured on his phone that day. He has acquiesced to every request the government has had since

14

he was a subject of their investigation. To claim that Mr. Johnston has not accepted responsibility because of the belief that a trial on the merits is, "riskier" defies all logic and calls into question the benefit of each and every guilty plea.

### B. U.S.S.G. § 2A2(b)(1) Does Not Apply

The government contends that Mr. Johnston was present at the entryway to the tunnel by the Lower West Terrace, where he, among many other individuals, approached a police line and became in possession of a police riot shield at the police line that was handed to him, which he then handed toward to the police. Statement of Offense at 4 (July 8, 2024) (ECF No. 161). Thereafter, the government states that Mr. Johnston engaged in the collective "heave ho" push against the police, in which his involvement in the effort "push[ed] against rioters in front of him *who then in turn pushed directly against the police*." *Id.* (emphasis added). These facts as presently stated in the government's Statement of Offense relating to any alleged physical contact with any U.S. Capitol Police officers do not satisfy § 2A2.4(b)(1)'s requirement that Mr. Johnston initiated "physical contact" with law enforcement during the events of January 6. The government's Statement of Offense does not, because there are not facts sufficient to support such an allegation and, accordingly, the application of a § 2A2.4(b)(1) enhancement is improper. The government's account of the events in support of the physical contact enhancement "inherently disregards" the "individualized analysis" of a January 6 defendant's conduct and fails to contemplate "the actions of the defendant himself or herself, not the actions of others[,]" by not providing facts specific to Mr. Johnston alleged physical contact with the officers at the Tunnel. *Tyng Jing Yang*, 2024 U.S. Dist. LEXIS 22938 at *12.

### C. U.S.S.G. § 2A2.4(b)(2) Does Not Apply

The government contends that the application of the U.S.S.G. § 2A2.4(b)(2), victim sustained bodily injury enhancement, applies to his sentence, increasing his sentence by two levels.

15

In support of this contention, the government argues that Officer Hodges sustained bodily injuries as a result of Mr. Johnston's "participation" in the "heave ho" push at the Tunnel, arguing that because Mr. Johnston had been in that Tunnel before "for some time *before* participating" in the pushing said to have cause Officer Hodge's injuries. Gov't Mem. at 27 (Oct. 21, 2024) (ECF No. 191).

Section 1B1.1 of the U.S.S.G. defines bodily injury as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." "Significant injury" within the purview of § 1B1.1's of the U.S.S.G. definition of "bodily injury" has been interpreted as "less than a 'serious bodily injury' or a 'permanent or life-threatening bodily injury'" which is concurrently "'presumptively greater than an 'insignificant injury,' for which no enhancement is indicated." *United States v. Lancaster*, 6 F.3d 208, 209 (4th Cir. 1993). Accordingly, courts rely on evidence of a bodily injury in making § 2A2.4(b)(2) enhancement determinations. To be clear, Mr. Johnston does not understate the gravity of the injuries Officer Hodges sustained on that day. Officer Hodge's testimony – at best – only describes the "group push effort" as the cause of his injuries; notably, when asked about the how the officer sustained a specific injury, Officer Hodges's responds, "I don't know specifically. I sustained many injuries that day." Officer Hodges Tr. at 214:20-23. Accordingly, and akin to the government's "violence-by-presence" theory as described in *Tyng Jing Yang*, Mr. Johnston's mere presence during the "group push effort," without more of a causal nexus between Mr. Johnston's specific actions and the injuries Officer Hodges sustained, cannot warrant application of the § 2A2.4(b)(2) enhancement because it is impossible to demonstrate evidence that Mr. Johnston caused bodily injury to Officer Hodges. *See Tyng Jing Yang*, 2024 U.S. Dist. LEXIS 22938 at *12 (the "inquiry turns on the actions of the defendant himself or herself, not the actions of others.").

16

D. U.S.S.G. § 4C1.2(c)(1) Should Not Apply

As discussed earlier, the government estimates Mr. Johnston's criminal history category to be two points based on criminal convictions that have yet to be substantiated with the appropriate documentation. Because the government avers that the § 4C1.2(c)(1) enhancement applies and increases Mr. Johnston's estimated offense level by two points, it subsequently argues that the adjustment for certain-zero-point offenders under § 4C1.1. cannot apply, which would reduce the estimated offense level by two points. Accordingly, because the government has not provided adequate documentation of the criminal records that it relies on for the two points resulting in a criminal history category of II, these two points cannot apply. Furthermore, since the points accorded under § 4C1.2(c)(1) do not apply, the two-point adjustment for zero-point offenders should apply.

\* \* \*

For the reasons and analysis discussed above, a more accurate total offense level for Mr. Johnston is 6, Zone A, which would reduce the guideline range 0-6 months, notwithstanding the considerations for the sentencing factors under 18 U.S.C. § 3553(a), as earlier described, which may reduce the estimated imprisonment range even further.

Even were the government to adopt the government's propounded Guidelines range, the Court should depart from this range because that range disproportionately reflects Mr. Johnston's conduct on January 6. Although the best plea offer Mr. Johnston was offered included an enhancement for physical contact, that physical contact actually did not involve physically touching an officer. Rather, the government contends Mr. Johnston's sentence should be enhanced because he touched another individual, who touched another individual, who touched another, and so forth. This is exactly the type of "group push effort," a court in this district rejected as a basis for increased culpability. *See Tyng Jing Yang.* 2024 U.S. Dist. LEXIS 22938 at *11-12 (D.D.C.

17

Feb. 9, 2024) ("The Court thus rejects the government's violence-by-presence theory of [U.S.S.G.] § 4C1.1(a)(3). In so doing, it joins the view of at least six other judges in this District.").

## CONCLUSION

For the reasons stated herein, Mr. Johnston respectfully asks this Court to sentence him pursuant to a total offense level of 9, reducing the imprisonment range to 4-10 months, while also considering the 18 U.S.C. § 3553(a) sentencing factors discussed herein.

Dated: October 24, 2024

Respectfully submitted,

*s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
Brand Woodward Law, LP
400 Fifth Street NW, Suite 350
Washington, DC 20010
202.996.7447 (telephone)
202.996.0113 (facsimile)
stanley@brandwoodwardlaw.com

*Counsel for Defendant Jay James Johnston*

## CERTIFICATE OF SERVICE

On October 24, 2024, undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which automatically sends electronic notification of such filing to all registered parties.

*s/ Stanley E. Woodward, Jr.*